# In re A-E-M-, Respondent

*Decided February 20, 1998*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1) The reasonableness of an alien's fear of persecution is reduced when his family remains in his native country unharmed for a long period of time after his departure.

(2) Where evidence from the United States Department of State indicates that country conditions have changed after an alien's departure from his native country and that the Peruvian Government has reduced the Shining Path's ability to carry out persecutory acts, the alien failed to establish a well-founded fear of persecution in Peru.

(3) An alien who failed to rebut evidence from the United States Department of State indicating that the Shining Path operates in only a few areas of Peru did not establish a well-founded fear of country-wide persecution in that country.

FOR RESPONDENTS: Donald L. Schlemmer, Esquire, Washington, D.C.

BEFORE: Board En Banc: DUNNE, Vice Chairman, VACCA, HEILMAN, HOLMES, HURWITZ, VILLAGELIU, FILPPU, COLE, MATHON, and JONES, Board Members. Dissenting Opinions: SCHMIDT, Chairman, joined by GUENDELSBERGER, Board Member; ROSENBERG, Board Member.

HURWITZ, Board Member:

In a decision dated March 18, 1996, an Immigration Judge found the respondents deportable as charged and denied their applications for asylum under section 208(a) of the Immigration and Nationality Act, 8 U.S.C. § 1158(a) (1994), and withholding of deportation under section 243(h) of the Act, 8 U.S.C. § 1253(h) (1994). In lieu of deportation, the Immigration Judge granted the respondents the privilege of voluntary departure under section 244(e)(1) of the Act, 8 U.S.C. § 1254(e)(1) (1994). The respondents have timely appealed the Immigration Judge's decision denying their applications for asylum and withholding of deportation. We deny the respondents' request for oral argument pursuant to 8 C.F.R. § 3.1(e) (1997), and we will dismiss their appeal.

## I. FACTUAL BACKGROUND

The record reveals that the primary respondent is a 40-year-old native and citizen of Peru, who entered the United States without inspection on

September 18, 1989. The co-respondent, who is married to the primary respondent, is a 37-year-old native and citizen of Peru who entered the United States without inspection on November 21, 1993. The primary respondent testified that he worked as a laborer at the ship docks in Lima, Peru, and was a member of the APRA political party. He stated that he assisted the APRA party in posting signs and painting, among other activities. The primary respondent recounted that in April and May of 1989, three of his friends were killed by the Shining Path guerrilla group approximately 4 miles from the primary respondent's workplace. These friends were APRA party members who distributed leaflets. The primary respondent claimed that in 1984, his uncle, who was employed as a police officer, was killed by Shining Path guerrillas. The uncle's daughter, also a police officer, was poisoned by Shining Path guerrillas in 1986. The primary respondent testified that at some point, a painted phrase appeared on the exterior of his house indicating that he would be "the next one"; he "assumed" that the Shining Path was responsible for this threat. The primary respondent stated that he was well known to the Shining Path because of his leadership position in local sports groups. Finally, he testified that he fears returning to Peru because the Shining Path will remember his face and kill him.[1]

## II. THE IMMIGRATION JUDGE'S DECISION

The Immigration Judge found the primary respondent to be a credible witness and found that the respondents had a subjective fear of persecution. He concluded, however, that the respondents' evidence did not prove past persecution or a well-founded fear of future persecution. The Immigration Judge also noted that because 6 1/2 years had passed since the primary respondent's departure from Peru, it was unlikely that the guerrillas would resume their threats against him. Finally, the Immigration Judge relied on the evidence of record to conclude that country conditions in Peru had improved since 1989.

## III. APPELLATE ARGUMENTS

The respondents have appealed, arguing that the Immigration Judge (1) denied them due process of law by failing to consider all of the evidence of record; (2) gave too much weight to certain pieces of evidence; (3) erroneously found that they did not meet their burdens of proof to merit a grant of asylum or withholding of deportation; and (4) violated international treaty obligations in failing to grant asylum or withholding of deportation.

---

[1] We also observe that the co-respondent's employer testified at the deportation hearing. Although the employer's testimony sheds light on the circumstances of the respondents' lives since their arrival in the United States, it does not assist the Board in resolving whether the respondents experienced past persecution or have a well-founded fear of persecution in Peru.

## IV.  ANALYSIS

An applicant qualifies as a refugee under section 101(a)(42)(A) of the Act, 8 U.S.C. § 1101(a)(42)(A) (1994), if he demonstrates that he has experienced persecution or has a well-founded fear of persecution in his home country on account of his race, religion, nationality, membership in a particular social group, or political opinion. *See M.A. v. United States INS*, 899 F.2d 304, 307 (4th Cir. 1990) (en banc); 62 Fed. Reg. 10,312, 10,342 (1997) (to be codified at 8 C.F.R. § 208.13(b)) (interim, effective Apr. 1, 1997). A fear of persecution is considered to be well founded under this section if it is genuine and if a reasonable person in the applicant's circumstances would fear persecution. *See INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987); *INS v. Stevic,* 467 U.S. 407 (1984); *Matter of Mogharrabi*, 19 I&N Dec. 439 (BIA 1987).

### A.  Past Persecution

First, we adopt the Immigration Judge's finding that the primary respondent provided credible testimony. Moreover, we agree with the Immigration Judge's conclusion that the primary respondent did not suffer past persecution in Peru on account of one of the five protected grounds under the Act. *See Cruz-Diaz v. INS*, 86 F.3d 330, 331 (4th Cir. 1996) (holding that the evidence did not prove that the applicant objectively feared persecution on account of actual or imputed political opinion). Although regrettable, the harassment that the primary respondent received in the form of a painted threat on his house does not rise to the level of persecution. *See, e.g., Ghaly v. INS,* 58 F.3d 1425, 1431 (9th Cir. 1995) (distinguishing between mere harassment or discrimination and persecution); *Fatin v. INS,* 12 F.3d 1233, 1240 (3d Cir. 1993) (finding that persecution within the Act does not encompass all treatment that society regards as unfair, unjust, or even unlawful or unconstitutional); *Matter of Kasinga*, 21 I&N Dec. 357, 365 (BIA 1996) (discussing the level of harm necessary to constitute persecution). Aside from this one threat, which the primary respondent could not link definitively to the Shining Path, the primary respondent admitted that neither he nor his immediate family had further encounters or problems with the Shining Path before his departure from Peru.

### B.  Well-founded Fear of Persecution

Next, we find that the primary respondent lacks an objective, well-founded fear of persecution from the Shining Path if he returns to Peru. *See generally Huaman-Cornelio v. Board of Immigration Appeals*, 979 F.2d 995, 1000 (4th Cir. 1992) (holding that the applicant failed to produce sufficient evidence to prove a well-founded fear of persecution at the hands of the Shining Path or the MRTA in Peru). We accept the primary respondent's testimony that Shining Path guerrillas murdered his uncle and cousin. However,

no evidence shows that these family members were murdered for reasons other than their status as police officers.[2] *See Matter of Fuentes*, 19 I&N Dec. 658, 661 (BIA 1988) (stating that "dangers faced by policemen as a result of that status alone are not ones faced on account of" one of the five protected grounds). Even assuming that these relatives were murdered over a decade ago for reasons outside of their occupations, the passage of time undermines the primary respondent's fear of harm based on the positions of his relatives. Furthermore, we note that the co-respondent remained unharmed in Peru for 4 years after the primary respondent's departure. Moreover, nowhere have the respondents argued that their family members have been harmed since the respondents' departures from Peru. *See Cuadras v. United States INS,* 910 F.2d 567, 571 (9th Cir. 1990) (holding that an applicant's fear of persecution is undercut when his or her family remains in the native country unharmed).

We also recognize that three of the primary respondent's APRA party friends allegedly were killed by Shining Path guerrillas. However, these murders occurred over 8 years ago, during a time when the Shining Path posed a greater threat to its political enemies and the general populace. As the evidence of record indicates, the Shining Path's ability to carry out retribution against its political opponents has diminished recently. *See* Bureau of Democracy, Human Rights and Labor, Dep't of State, *Peru - Profile of Asylum Claims & Country Conditions* 3 (Jan. 1996) [hereinafter *Profile*] (made part of the record of proceedings). The *Profile* states that the Peruvian Government "has seriously damaged" the Shining Path, "especially by apprehending its principal leaders, including Abimael Guzman, the founder, leader, and chief strategist of the organization, who was tried, convicted, and jailed for life in late 1992." *Id*. at 4. This source further reports that the "dismantling of [the Shining Path's] command and control structure" has been accompanied by a greater than 50 percent drop in the number of people murdered by the organization. *Id*.

Furthermore, in light of the country conditions evidence of record which states that the Shining Path operates in only a few areas of Peru, the respondents have not provided any evidence to suggest that their fear of persecution from the Shining Path would exist throughout that country. *See Matter of C-A-L-,* 21 I&N Dec. 754, 759 (BIA 1997) (discussing internal relocation). In light of this and the other evidence of record, we find that the respondents' "allegations do not provide the 'specific and objective facts' necessary to 'support an inference of risk of future persecution.'" *Figeroa v. INS*, 886 F.2d

---

[2] The primary respondent testified that the Shining Path murdered his uncle because "[a]s a police officer, he was concern[ed] with caring and looking after people, and the Shining Path had their eyes on these people." The primary respondent further testified that his cousin, who was "very interested in finding out" how her father had been murdered, subsequently was killed by the Shining Path.

76, 80 (4th Cir. 1989) (quoting *Cardoza-Fonseca v. INS*, 767 F.2d 1448, 1453 (9th Cir. 1985), *aff'd*, 480 U.S. 421 (1987)).

The dissenting opinions in the instant case cite with approval *Gonzalez-Neyra v. INS*, 122 F.3d 1293 (9th Cir. 1997), *reh'g denied and amended*, 133 F.3d 726, 1998 WL 3590 (9th Cir. Jan. 6, 1998). In *Gonzalez-Neyra v. INS*, the United States Court of Appeals for the Ninth Circuit reversed and remanded a Board decision that dismissed a Peruvian alien's appeal from the denial of his asylum claim. Upon review, we find that the facts of that case are distinguishable from the facts of the instant case. The alien in *Gonzalez-Neyra v. INS* was forced for 9 months (from April 1990 to January 1991) to make payments to men who were later revealed to be Shining Path guerrillas. *Id.* at 1294. When he learned that the extortionists were Shining Path guerrillas, he directly told them that he would no longer give them money to support their armed struggle. The guerrillas personally ordered him to close his video game business and warned him that he risked death if he refused. After making one further payment to the guerrillas, he fled his home and business. His fear of retaliation from the Shining Path members who had extorted money from him subsequently became heightened when he learned that these guerrillas had been identified in the press. Furthermore, after he fled his home and business, his family informed him that anonymous persons continued to demand information of his whereabouts. *Id.*

The instant case involves dissimilar facts and circumstances. The primary respondent in this case never had a face-to-face encounter with his alleged persecutors. In fact, the only direct harm experienced by the respondent was a painted threat on his house, allegedly by the Shining Path. The respondent has not shown that the harm which befell his uncle and cousin, who were murdered in 1984 and 1986 by the Shining Path, was inflicted on account of membership in the respondent's family or political opinion. Additionally, the respondent has offered no evidence that the Shining Path continues to be interested in his whereabouts since his departure from Peru. Finally, we observe that the instant case is controlled by neither *Gonzalez-Neyra v. INS, supra*, nor the law of the Ninth Circuit, but rather by the law of the Fourth Circuit. According to applicable Fourth Circuit law, we find that the respondents in the instant case have not adduced sufficient objective facts to support an inference that they risk future persecution. *Figeroa v. INS, supra; see also Huaman-Cornelio v. Board of Immigration Appeals, supra,* at 1000 (holding that the Peruvian applicant failed to offer concrete facts to support his alleged well-founded fear of persecution at the hands of the Shining Path or the MRTA).

Although we sympathize with the respondents, who endured social and political unrest in Peru before making a successful life for themselves in the United States, for the reasons discussed above we conclude that they failed to present sufficient evidence to support their asylum claim. As the respondents have failed to satisfy the lower burden of proof required for asylum, it

follows that they also have failed to satisfy the clear probability standard of eligibility required for withholding of deportation. *See Matter of Mogharrabi, supra*; 62 Fed. Reg. 10,312, 10,343-44 (1997) (to be codified at 8 C.F.R. § 208.16) (interim, effective Apr. 1, 1997). The evidence does not establish that it is more likely than not that the respondents would be subject to persecution on account of one of the five grounds specified in section 243(h) of the Act. *See INS v. Cardoza-Fonseca, supra; INS v. Stevic, supra*.

Additionally, we consider the respondents' contention that their deportation would violate both the Geneva Convention Relative to the Protection of Civilian Persons in Time of War[3] and customary international law. We note that such arguments were discussed and rejected in the Board's decision in *Matter of Medina*, 19 I&N Dec. 734 (BIA 1988). As we held in *Matter of Medina*, neither the Geneva Convention nor customary international law creates a potential remedy from deportation that can be sought by individual aliens in deportation proceedings over and above that provided by the Act, as implemented by regulation. Additionally, we held that "even if it were assumed that customary international law could provide a basis for individual aliens to assert a right that their deportation be withheld, . . . [t]he authority to consider such requests has not been delegated by the Attorney General to the immigration judges or this Board." *Id*. at 746.

Finally, inasmuch as we have reviewed the record on a de novo basis, we find that the respondents have not suffered any prejudice due to the Immigration Judge's alleged failure to properly consider and weigh the evidence of record.[4] *See Matter of Burbano*, 20 I&N Dec. 872, 874 (BIA 1994); *Matter of Edwards,* 20 I&N Dec. 191, 196 (BIA 1990).

In light of the foregoing, we enter the following orders.

**ORDER:**     The respondents' appeal is dismissed.

**FURTHER ORDER:**     Pursuant to the Immigration Judge's order and in accordance with our decision in *Matter of Chouliaris*, 16 I&N Dec. 168 (BIA 1977), the respondents are permitted to depart from the United States voluntarily within 30 days from the date of this order or any extension beyond that time as may be granted by the district director; and in the event of failure to so depart, the respondents shall be deported as provided in the Immigration Judge's order.

---

[3] Geneva Convention No. IV, Aug. 12, 1949, 6 U.S.T. 3516, T.I.A.S. No. 3365, 75 U.N.T.S. 287 (entered into force for the United States Feb. 2, 1956).

[4] In this regard, we note that we have fully considered the evidence of record which states that a "guerrilla war" (referred to by the respondents on brief as a "civil war") has been waged by the Shining Path and another terrorist organization since 1980. *See* Committees on International Relations and Foreign Relations, 104th Cong., 2d Sess., *Country Reports on Human Rights Practices for 1995* 2 (Joint Comm. Print 1996) (copy made part of the record of proceedings). However, as discussed above, other documentary evidence of record shows that the Peruvian Government has curtailed sharply the Shining Path's ability to wage this "war."

D*ISSENTING OPINION:* Paul W. Schmidt, Chairman, in which John W. Guendelsberger, Board Member, joined

I respectfully dissent.

The primary respondent has presented credible testimony establishing that a reasonable person in his circumstances would fear political persecution at the hands of the Shining Path guerrillas if returned to Peru. The objective reasonableness of the primary respondent's fear is confirmed by the two reports from the United States Department of State, Bureau of Democracy, Human Rights, and Labor contained in the record. I would sustain the respondents' appeal and grant them asylum.

The primary respondent testified credibly that his uncle and his cousin were murdered by Shining Path guerrillas. Those murders, 2 years apart, appear to be more than coincidental. Although both the uncle and the cousin were police officers, both were killed while off-duty. The uncle was driving his pick-up truck and the cousin was poisoned in her residence. Those circumstances lead to the reasonable conclusion that both were killed by the Shining Path for their imputed political support of the Peruvian Government, rather than because of activities performed in the line of duty as law enforcement officers. *Cf. Matter of S-P-*, 21 I&N Dec. 486 (BIA 1996) (stating that circumstances can support a finding of persecution on account of imputed political opinion even where other motives for mistreatment are possible).

Therefore, this case is not controlled by *Matter of Fuentes*, 19 I&N Dec. 658 (BIA 1988), which held that a policeman does not suffer persecution for refugee purposes on the basis of acts directed against him while performing his official duties during a time of civil conflict. On the contrary, in *Fuentes* we recognized that a former policeman, that is, one no longer performing official law enforcement duties, could suffer persecution on account of political opinion or membership in a particular social group. The situation of the uncle and the cousin is analogous to that of a former policeman. The primary respondent's objective fear is also supported by credible testimony that the Shining Path murdered three of his friends who, like the respondent, were politically active in the APRA political party.

The State Department reports in the record confirm that, notwithstanding Peruvian Government efforts that have diminished its strength, the Shining Path retains both the will and the ability to inflict harm on targeted individuals and groups throughout Peru. This case is very similar to a recent case where the United States Court of Appeals for the Ninth Circuit Court, relying to a large extent on a dissenting opinion by Board Member Rosenberg, rejected the Board's conclusion that conditions had changed in Peru so as to eliminate most claims of persecution at the hands of the Shining Path. *Gonzalez-Neyra v. INS*, 122 F.3d 1293 (9th Cir. 1997), *reh'g denied and amended*, 133 F.3d 726, 1998 WL 3590 (9th Cir. Jan. 6, 1998).

The primary respondent has established an objective basis that would lead a reasonable person to fear political persecution at the hands of the Shining Path if returned to Peru. Therefore, I would sustain the respondents' appeal and grant them asylum. Consequently, I respectfully dissent from the dismissal of the appeal.

## DISSENTING OPINION: Lory D. Rosenberg, Board Member

I respectfully dissent.

> One rarely rushes into a single error. Rushing into the first one, one always does too much. So one usually perpetrates another one—and now one does too little.

Friedrich Nietzsche, *Twilight of the Idols, in The Portable Nietzsche*, 463, 470 (Walter Kaufmann ed. and trans., 1982)

This appeal involves a respondent[1] from Peru who established by credible testimony that he was politically active, both locally and nationally, in the APRA political party. As a result, the respondent was subjected to threats by Shining Path guerrillas, and members of his family and several of his fellow party workers were targeted and then murdered by the Shining Path. The respondent received a direct threat against his own life—a painted sign on his house that he would be "the next one"—which, along with the deaths of his uncle, his cousin, and his friends, precipitated his departure from Peru.

It is my view that the majority, betraying (not for the first time) apparent indifference to controlling Supreme Court, circuit court, and Board precedent, has rushed headlong into a series of erroneous conclusions concerning the respondent's asylum claim, contorting the evidence of record to support outcome they have reached: denial of the respondent's credible claim of a well-founded fear of persecution in his homeland. To achieve this unfortunately, but transparently, predetermined result, the majority methodically has discounted the "concrete facts" that form an objective basis for the respondent's asylum claim.

In the process, the majority is content to characterize the record's overwhelming evidence of the Shining Path guerrillas' intent to target and assassinate the respondent as but a series of "regrettable" incidents that, taken individually or cumulatively, do not merit relief from this adjudicative tribunal. *Matter of A-E-M-*, 21 I&N Dec. 1157, 1159 (BIA 1998). In the end, the majority becomes convinced by its own accretion of errors and, unfortunately for the respondent, by doing so much they do distinctly too little.

---

[1] I note that it is the male respondent, and not his wife, who is the principle subject of the persecution claim on appeal, and consequently use the term "respondent" in the singular to refer to the salient facts of persecution involved.

## I. THE RESPONDENT IS ENTITLED TO A FAIR AND REASONABLE ASSESSMENT OF HIS TESTIMONY PRESENTED UNDER THE APPLICABLE STANDARD

The United States Court of Appeals for the Fourth Circuit, in which this case arises, has stated that an asylum applicant's testimony alone is sufficient to establish his or her eligibility for relief where such testimony is "credible, persuasive, and refers to '*specific* facts that give rise to an inference that the applicant has been or has a good reason to fear that he or she will be singled out for persecution'" on account of an enumerated ground. *Figeroa v. INS,* 886 F.2d 76, 80 (4th Cir. 1989) (quoting *Cardoza-Fonseca v. INS*, 767 F.2d 1448, 1453 (9th Cir. 1985) (noting that establishment of objective facts through testimony alone does not make them any less objective), *aff'd*, 480 U.S. 421 (1987)); *see also Huaman-Cornelio v. Board of Immigration Appeals*, 979 F.2d 995 (4th Cir. 1992) (requiring evidence of objective facts to establish a well-founded fear of persecution). The respondent has provided such testimony.

In uncontroverted testimony before the Immigration Judge, accepted by the majority as being credible, the respondent related that he, like his father before him, was an active supporter of the APRA political party, and distributed leaflets, posted signs, and painted placards on behalf of the party. In April and May of 1989, three of the respondent's friends with whom he worked and who also were APRA party members who, like the respondent, distributed leaflets in support of the party, were killed by Shining Path guerrillas approximately 4 miles from the respondent's workplace. The respondent testified that, at some later point, the Shining Path painted a phrase on his house indicating that he would be "the next one."

He related that he was well known personally to the Shining Path because of his activities in APRA and because of the fact that he held a leadership position in local sports groups. In addition, in 1984, prior to the time his associates were murdered and he received the direct death threat painted on his house, the respondent's uncle, who had been employed as a police officer, was killed by the Shining Path. The uncle's daughter, also a police officer, was murdered by the Shining Path in 1986. Based on these specific facts and circumstances, the respondent testified that he fears returning to Peru because he believes that the Shining Path will remember his face and kill him.

Thus, the essential elements of the respondent's asylum claim are not in dispute. For its part, the majority does not differ with the Immigration Judge's recitation of these facts, and has agreed that the respondent is a credible witness. The majority has, nevertheless, adopted the conclusion of the Immigration Judge who found that the respondent had not established past persecution, and noted that 6 ½ years had passed since the respondent's departure from Peru, and that conditions in the country had improved since that time.

Although I agree that the specific facts presented—murder of three compatriots by the Shining Path and the desecration of the outside of the respondent's house with a painted death threat—may not establish *past* persecution, whether or not these circumstances constitute past persecution is not dispositive of his contention that he has a well-founded fear of persecution. An asylum-seeker is not required to establish that past incidents constituted persecution in order to establish a well-founded fear of future persecution. *See Shirazi-Parsa v. INS*, 14 F.3d 1424 (9th Cir. 1994) (holding that evidence that an individual was interrogated and released does not foreclose a well-founded fear of persecution in the future); *see also Abdel-Masieh v. United States INS*, 73 F.3d 579, 584 (5th Cir. 1996) (reversing the denial of asylum based on the Board's conclusion that an individual who had been detained twice but not mistreated to the degree that would constitute "persecution" had no fear of persecution in the future, because there "is little reason to generally suppose . . . [that such past actions] create an 'outer limit' on [the government's] future actions").

The majority, however, declines to meaningfully assess the circumstances as they existed at the time of the respondent's departure or to make a determination of whether the facts related indicate that, at the time of his departure from Peru, the respondent had a well-founded fear of persecution by the Shining Path on account of his political opinion. *See Gonzales v. INS*, 82 F.3d 903, 911 (9th Cir. 1996) (criticizing the Board for failing to discuss the evidence "as it stood when [the applicant's] hearing concluded" and stating that the passage of time and change of government in a country is not dispositive of whether an asylum applicant has established a well-founded fear of persecution). The absence of a specific finding, either endorsing or refuting that the facts establish that the respondent's fear of persecution was well founded when he fled his country, should not be lost on the casual reader. The extent to which the respondent's fear was well founded when his colleagues were murdered, the personal threat to him was received, and he fled, is the central consideration in assessing whether, at the time of the Immigration Judge's adjudication, or this Board's review of that adjudication, the respondent has a well-founded fear of persecution. *Huaman Cornelio v. Board of Immigration Appeals, supra*. That determination is a critical element in our disposition of the claim under the country conditions that exist in Peru today.

The majority evades the issue of whether the respondent's credible account now or ever supported a well-founded fear of persecution as a matter of law, and moves straightaway to the conclusion that, whatever fear the respondent may reasonably have possessed when he fled Peru in September 1989, the passage of the time and a purported reduction in Shining Path influence have eviscerated his asylum claim. Using this technique, the majority attempts to avoid ever having to confront the significance of the actual threats received by the respondent, and minimizes or ignores the relevance of the

political killings of his colleagues, and the actual murders that occurred in his family.

In addition, in the context of discussing past persecution, the majority contends that the respondent "could not link definitively to the Shining Path" the death threat that was painted on his house. I note, however, that all of the evidence in the record before us, including the respondent's position in the APRA party, his association with family members and friends who were killed by the Shining Path, and the timing of the desecration of his house in this way, points to the Shining Path. Moreover, merely suggesting an alternate explanation might exist says little about the reasonableness, in objective terms, of the specific objective facts presented and the respondent's fear that this threat came from the Shining Path.

The standard under which we operate is "reasonableness," not "definitiveness." *See M.A. v. United States INS*, 899 F.2d 304, 311 (4th Cir. 1990) (en banc). According to the principle of Occam's razor, the best explanation of an event is the one that is the simplest, using the fewest assumptions or hypotheses. *See* Webster's II New Riverside University Dictionary 813 (1994). Nevertheless, the majority concludes that the respondent failed to provide "'the "specific and objective facts" necessary to "support an inference of risk of future persecution."'" *Matter of A-E-M-, supra*, at 1160 (quoting *Figeroa v. INS, supra,* at 80 (quoting *Cardoza-Fonseca v. INS, supra*, at 1453)). I do not agree, finding this result to be contrary to the Supreme Court's decision in *INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987), and to our precedent. *Matter of Mogharrabi*, 19 I&N Dec. 439 (BIA 1987), recognizing that the specific facts contemplated were those that would support inferring a likelihood, and not a probability or a certainty, of persecution. Not only do I disagree in terms of the result reached by the majority, but I do not believe the majority has given this asylum-seeker the fair and reasonable consideration to which he is entitled.

## II. DETERMINATION OF THE PRESENCE OF OBJECTIVE FACTS ESTABLISHING A WELL-FOUNDED FEAR OF PERSECUTION

That the respondent clearly harbored a well-founded fear of harm from Shining Path guerrillas at the time that he fled his homeland arises from the following objective facts: (1) the respondent was similarly situated to three fellow party workers who were murdered by the Shining Path; (2) the respondent received specific threats from Shining Path guerrillas, including a written warning on his house that he would be "the next one"; and (3) two of the respondent's family members, who shared his opposition to the Shining Path, were murdered by the anti-government guerrillas. *Huaman-Cornelio v. Board of Immigration Appeals, supra,* at 999 (distinguishing a genuine fear based on unsupported hypotheses from evidence of a fear supported by concrete facts showing that fear to be objectively reasonable).

### A. Politically Motivated Harm to Persons "Similarly Situated"

The majority does not dispute that Shining Path guerrillas murdered three of the respondent's friends. Like the respondent, the individuals killed were active members of the APRA political party and carried out duties similar to those he carried out. The courts have held that in proving a well-founded fear of persecution, an asylum applicant is not required to demonstrate that he would be "singled out" for harm if he can establish (1) a pattern or practice of persecution of persons similarly situated to the applicant on account of a protected ground and (2) that he is a member of and identifies with such persons such that his fear of return is reasonable. *See, e.g., Osorio v. INS*, 18 F.3d 1017, 1031 (2d Cir. 1994); *see also* 8 C.F.R. §§ 208.13(b)(2)(I)(A), (B) (1997). In addition, this Board has recognized, in decisions having precedential authority, the concept that what has happened to persons similarly situated has a bearing on the claim made by an asylum-seeker. *Matter of Mogharrabi, supra,* at 446 (stating that where the country at issue has a history of persecuting people in circumstances similar to those of the asylum-seeker, careful consideration should be given to that fact).

Furthermore, the courts have stated that an asylum applicant's fear of retaliation from a guerrilla organization, owing to his vocal political opposition to the group, is well founded where he has received death threats and where similarly situated persons have been murdered by the organization. *Sotelo-Aquije v. Slattery*, 17 F.3d 33, 37 (2d Cir. 1994), *rev'd on other grounds,* 62 F.3d 54 (2d Cir. 1995); *Osorio v. INS, supra*, at 1029. The mere fact that an applicant has not yet been physically harmed by the individuals or group that he claims to fear, or *has not had a face-to-face encounter with the guerrillas*, does not indicate that he lacks a well-founded fear of persecution. *Sotelo-Aquije v. Slattery, supra*, at 37; *see also Turcios v. INS*, 821 F.2d 1396, 1402 (9th Cir. 1987). So long as the applicant's fear of persecution upon return is reasonable, a grant of asylum is warranted. *Sotelo-Aquije v. Slattery, supra,* at 37.

Instead of addressing directly the respondent's circumstances, the majority has raised jurisdictional and substantive concerns about the dissents' citations to *Gonzalez-Neyra v. INS*, 122 F.3d 1293 (9th Cir. 1997), *reh'g denied and amended*, 133 F.3d 726, 1998 WL 3590 (9th Cir. Jan. 6, 1998). According to the majority, the Ninth Circuit's decision in *Gonzalez-Neyra v. INS* is distinguishable "on the facts" from the instant case, because unlike Gonzalez-Neyra, "[t]he primary respondent in this case never had a face-to-face encounter with his alleged persecutors. In fact, the only direct harm experienced by the respondent was a painted threat on his house, allegedly by the Shining Path." *Matter of A-E-M-, supra*, at 1161.

So, in the judgment of the majority, evidence of the guerillas' single confrontation with a business man (who holds a political view but is not politically active) in which a threat is made to him and his property (but no

immediate harm was incurred), as in *Gonzalez-Neyra v. INS, supra,* at 1294-95, now does constitute a reasonable likelihood of persecution.[2] By contrast, according to the majority, the invasion of the respondent's property and privacy resulting in a violent defacement of the respondent's home with a painted death threat, which followed the murder of three of his friends and fellow APRA party workers by the Shining Path approximately 4 miles from where they and he worked, does not constitute a reasonable likelihood of persecution because the face-to-face confrontation was not to his person, but to his home. *See Gonzalez-Neyra v. INS, supra; Sotelo-Aquije v. Slattery, supra*, at 37. In my view, such a distinction is patently unreasonable.

The respondent has presented credible, compelling evidence that persons to whom he is similarly situated were singled out and assassinated by the Shining Path, owing to their political opposition to the terrorist group. The respondent noted that his friends' bodies were found only 4 miles from their workplace, where he also was employed. Although the majority has declined to squarely address the issue, the murders of the respondent's three compatriots constitute objective facts that indisputably support the respondent's assertion of a well-founded fear of persecution. *Huaman-Cornelio v. Board of Immigration Appeals, supra; see also Osorio v. INS, supra; Sotelo-Aquije v. Slattery, supra*. Furthermore, the killings indicate that the Shining Path has the ability or inclination to punish the respondent for holding a political belief, i.e., one supporting a different political alternative and opposing the program of the Shining Path, which the guerrillas consider offensive. *See Matter of S-P-*, 21 I&N Dec. 486 (BIA 1996); *Matter of Mogharrabi, supra*. This evidence constitutes objective facts that support the respondent's subjective fears that he was and will be targeted by the Shining Path.

## B. Specific Threats Directed at the Respondent

Not only is the respondent similarly situated to other persons who suffered persecution at the hands of the Shining Path, he also has presented evidence that he was individually targeted by the guerrillas for the same, fatal treatment. *Cf. Osorio v. INS, supra*, at 1031 (holding that an asylum applicant who establishes a pattern or practice of persecution of others similarly situated need not demonstrate that he would be singled out for persecution). Prior to his departure from Peru, the respondent received a painted warning on his

---

[2] I note that the respondent in *Gonzalez-Neyra v. INS, supra*, never would have been in a position to petition for review before the United States Court of Appeals for the Ninth Circuit but for the fact that the Board, by a 2-1 majority, denied his claim that his refusal to comply with extortion demands resulting in the threat to his life and property constituted persecution. *See Matter of T-M-B-*, 21 I&N Dec.775 (BIA 1997) (holding that criminal extortion efforts do not constitute persecution "on account of" political opinion *where it is reasonable* to conclude that those who issued threats or inflicted harm on an asylum applicant were not motivated by their victim's political opinion); *cf. id.* (Rosenberg, dissenting) (discussing evidence of greater harm inflicted on respondent following her declaration of political opposition to the NPA).

house that he was to be "the next one." This threat followed the murders of his friends and fellow party workers by the Shining Path, and also followed the killings of his uncle and his cousin by the guerrillas. The majority finds that, although "regrettable," the painted threat was mere harassment which does not rise to the level of persecution. *Matter of A-E-M-, supra*, at 1159. I find their conclusion callous and dismissive, and find it "regrettable" that they refuse to acknowledge that such a threat clearly supports the respondent's well-founded fear of persecution, even if it does not, standing alone, constitute *past* persecution.

In deciding whether a threat received from a purported persecutor supports an alien's claimed fear of persecution, "[t]he essential element is that the threat be such that a reasonable person would find it credible, based on what that person has experienced and witnessed." *Sotelo-Aquije v. Slattery, supra,* at 37; *see also Carranza-Hernandez v. INS*, 12 F.3d 4, 7-8 (2d Cir. 1993); *Huaman-Cornelio v. Board of Immigration Appeals, supra*. The threat received by the respondent was chilling and unambiguous, and followed unmistakable examples of the Shining Path's ability to exact retribution against its political enemies. Given the murders of his uncle, his cousin, and his three friends at the hands of Shining Path guerrillas, the respondent's apprehension that the warning he received would be carried out is clearly well founded. As further evidence that he believed the Shining Path's warning, he fled Peru soon after receiving the threat. Accordingly, I believe that the majority has erred in minimizing the respondent's plainly articulated fear that if he returned to Peru, "[t]hey would kill me."

## C. Politically Motivated Harm to Family Members

The respondent's asylum claim is buttressed by his asserted fear of persecution owing to his affiliation with family members who were targeted and murdered by the Shining Path. The respondent testified credibly that his father had been an active member of the APRA party since he was a young child and that his father participated in numerous party activities. Such involvement led to the respondent's family receiving threats from the Shining Path guerrillas, because they were "strong supporters of the APRA party and because [they] strongly supported and encouraged people to participate in the electoral process, in spite of the threats from the Shining Path to sabotage the elections and kill those who took part in the elections process."

The respondent testified further that his uncle and his cousin, both of whom were police officers, were murdered by the Shining Path in their off-duty hours—not as police personnel but as political opponents. The majority's negative presumption to the effect that "no evidence shows that these family members were murdered for reasons other than their status as police officers," *see Matter of A-E-M-, supra*, at 1159-60, is unwarranted, as the respondent testified to the contrary and the record contains no evidence

indicating that the respondent's uncle or cousin *were* assassinated owing to their occupations. *See* Occam razor principle, *supra*. To the contrary, the evidence presented suggests the respondent's family members were murdered during off-duty hours for reasons other than merely their status as police officers.[3] *Cf. Matter of Fuentes*, 19 I&N Dec. 658, 661 (BIA 1988) (holding that "dangers faced by policemen *as a result of that status alone* are not ones faced on account of" one of the five protected grounds). (Emphasis added.)

Both this Board and the courts have recognized that the mistreatment of family members has a bearing on the persecution suffered by an asylum applicant. The treatment of the respondent's uncle and cousin bolsters the view that his fear is well founded. *See Ananeh-Firempong v. INS*, 766 F.2d 621 (1st Cir. 1985) (concluding that evidence of mistreatment of one's family is probative of a threat to the petitioner); Office of the United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* para. 43, at 13 (Geneva, 1992)[hereinafter *Handbook*] (stating that an applicant need not show a threat of persecution based on personal experience, as evidence concerning relatives may support the conclusion that fear is well founded);[4] *Ramos-Vasquez v. INS*, 57 F.3d 857 (9th Cir. 1995) (finding that violence against friends and family which creates a pattern of persecution closely tied to the petitioner may establish a well-founded fear) (citing *Ariaga-Barrientos v. INS*, 937 F.2d 411, 414 (9th Cir. 1991)); *see also Matter of Villalta*, 20 I&N Dec. 142 (BIA 1990) (holding that threats of harm to immediate family in part on account of the applicant's political activities, and the actual murder of his brother, supported a well-founded fear of persecution).

Just as the Shining Path attributed to the respondent's father, uncle, and cousin a political opinion antithetical to their cause, so too did the respondent become an object of harm, because it was reasonable, given his affiliations and activities, for the guerrillas to identify him as holding a political opinion similar to his relatives. *See Montecino v. INS*, 915 F.2d 518, 519 (9th Cir.

---

[3] The respondent testified that his uncle "was found dead in the pick-up truck he was driving." According to the respondent, "[A]s a police officer, he was concern [sic] with caring and looking after people, and the Shining Path had their eyes on these people." Furthermore, he testified that his cousin, who was the daughter of his murdered uncle, was found dead from poisoning in the respondent's home. He related that prior to her death, she had been "very interested in finding out what happened how my uncle died."

[4] The *Handbook* provides practical guidance to government officials as they are determining refugee status under the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, which was enacted to bring United States refugee law into conformance with our international obligation of nonrefoulement under the United Nations Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 137 and the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 267. *INS v. Cardoza-Fonseca, supra,* at 436-37 (1987); *Matter of Q-T-M-T-*, 21 I&N Dec. 722 (BIA 1996) (Rosenberg, dissenting); *Matter of Rodriguez-Palma*, 17 I&N Dec. 465, 468 (BIA 1980).

1990); *see also Hernandez-Ortiz v. INS,* 777 F.2d 509, 515 (9th Cir. 1985) ("The fact that there have been a number of threats or acts of violence against members of an alien's family is sufficient to support the conclusion that the alien's life or freedom is endangered."). Furthermore, the respondent provided evidence that the guerrillas *were aware* of his views, *could be aware* of his family ties, and *actively pursued him* after the deaths of his relatives. *See Matter of Mogharrabi, supra.* The majority nevertheless refuses to accord these facts any significance with respect to the respondent's present situation. To do so would mean the majority had to give the respondent's claim more credence.

Finally, in the absence of any showing that *other* members of the respondent's family were known to hold political views antithetical to the Shining Path, or were actively associated with his father, his uncle, or his cousin as he was, the fact that certain members of the respondent's family remained in Peru without further harm is hardly determinative of the risk of persecution to the respondent. In this case, the "family member" was the respondent's wife, who was not politically active and who would not necessarily be associated with the respondent's father, uncle or cousin, or with his co-workers. *Cf. Cuadras v. United States INS,* 910 F.2d 567, 571 (9th Cir 1990).[5]

### III. CONSIDERATIONS OF COUNTRY CONDITIONS IN THE WELL-FOUNDED FEAR ASSESSMENT

I find that the respondent's credible account of his experiences leads to the unavoidable conclusion, which was skirted by the majority, that he had an objective, well-founded fear of harm at the hands of the Shining Path at the time of his departure from Peru. *See Matter of S-P-, supra; see also Huaman-Cornelio v. Board of Immigration Appeals, supra,* at 1000; *Handbook, supra,* paras. 196, 203-204, at 47-48 (providing that in cases where an adjudicator is satisfied as to an asylum applicant's general credibility, and absent "good reasons to the contrary," the applicant should be given the benefit of the doubt with respect to his or her claim). The question thus becomes, whether, since that time, conditions have changed to such an extent as to eliminate the respondent's well-founded fear. The majority concludes that

---

[5] In a telling example of doing too much only to do too little, the majority imposes the principle, without qualification, that an asylum-seeker's reasonable fear of persecution is reduced when family members who remain behind are unharmed. In fact, Cuadras testified that he and his family were farmers who left farming when guerrillas threatened him, his father, and his brother if they continued to farm, but reported that although harassment stopped when he went into the military and his brother went into construction, the guerrillas threatened to harm Cuadras' father and brother if they tried to begin farming again. It is under these circumstances that the Ninth Circuit stated, "Cuadras's claims are further undercut by the fact that his father and brother have not been harmed, and they apparently still reside unmolested in El Salvador." *Cuadras v. United States INS, supra*, at 571.

they have. The evidence of record, however, does not support their conclusion.

As noted, the majority's denial of the respondent's asylum claim is based primarily on its finding that country conditions in Peru have changed to such an extent that the respondent's fear is not (or, is no longer) well founded. This conclusion, however, rests upon the majority's selective use of information provided in two Department of State documents contained in the record. The first is the Bureau of Democracy, Human Rights, and Labor, U.S. Dep't of State, *Peru - Profile of Asylum Claims & Country Conditions* (Jan. 1996) [hereinafter *Profile*]. The second is a U.S. Dep't of State, *Peru Human Rights Practices, 1995* (March 1996) [hereinafter *Human Rights Report*]. These documents purportedly address relevant country conditions in Peru that have a bearing on the reasonableness of the respondent's claim. *See Matter of S-M-J-*, 21 I&N Dec. 722 (BIA 1997).

Upon examination, however, it becomes clear that the documents on which the majority relies support the respondent's claim of continuing Shining Path intimidation, terror, and individual persecution at least as strongly as they support the majority's position that the guerrillas no longer pose a serious threat.[6] *See Gonzalez-Neyra v. INS, supra*. The *Profile* provides:

> [D]espite its reduced capacity, the Shining Path *is still mentioned most frequently as the abuser* in asylum claims from Peru. Lacking widespread support, *it has used terror* against civilians regardless of their political allegiance as part of its overall strategy to create chaos and make the country ungovernable. During 1994, guerrilla victims included peasants, farmers, villagers, Indians, civil authorities and public servants, politicians, businessmen, development and human rights workers, educators and students, labor leaders, and religious workers as well as 40 members of the security forces.

*Profile, supra*, at 4 (emphasis added). The document notes further that although the organization enjoys a reduced ability to "mount coordinated attacks with large numbers . . . , *the Shining Path retains the capacity to launch destructive terrorist attacks even on well-protected targets*. In urban areas, it often uses car bombs and other explosive devices in its campaign of terror." *Id*. (emphasis added).

In addition, the *Human Rights Report* frequently refers to the Shining Path's continuing ability to terrorize the populace and target its political enemies for persecution and death. According to the report, although the guerrillas' overall influence has reduced in recent years, "*where it continues to operate, Sendero Luminoso [the Shining Path] continues to assassinate*

---

[6] It should be noted that, although these are authoritative documents, provided pursuant to the regulations and our holding in *Matter of S-M-J-*, 21 I&N Dec. 722 (BIA 1997), "there is perennial concern that the [State] Department soft-pedals human rights violations by countries . . . with which the United States wants to have friendly relations." *Gramatikov v. INS*, 128 F.3d 619 (7h Cir. 1997); *see also Matter of T-M-B-*, 21 I&N Dec. 775 (BIA 1997). (Rosenberg, dissenting).

civilians who oppose it." *Human Rights Report, supra*, at 4 (emphasis added). In addition, "Many victims of Sendero Luminoso terrorism also showed signs of torture. *Credible accounts indicate that Sendero tortured people to death by slitting throats, strangulation, stoning, and burning. Mutilation of the body was common." Id.* at 6 (emphasis added). According to the Department of State, "Although both the army and Sendero Luminoso committed serious human rights abuses in Peru's internal conflict, *the latter was responsible for many more heinous acts*," including detonating bombs in public places, killing villagers at random, and forcible conscription of children. *Id.* at 13 (emphasis added).

Is this a report describing a group whose capacity and inclination for persecution has diminished in the sense it obviates or nullifies an otherwise valid fear of persecution by a group outside the government's control? *See Matter of Mogharrabi, supra*. Notwithstanding overwhelming evidence, the majority persists in its conclusion that, because the Shining Path's influence and ability to engage in widespread terror have diminished somewhat in recent years, the respondent's fear of being targeted upon his return is no longer "reasonable." Moreover, the majority intimates that the respondent could evade the Shining Path and avoid future persecution simply by relocating within his home country. *Matter of A-E-M-, supra*, at 1159. Bordering on the ridiculous, their conclusions simply lack support.

## A. Reasonableness of Respondent's Fear

"Reasonable" means, as qualified and quantified by the Supreme Court, at least a 10 percent chance that an individual may be murdered, tortured, or otherwise persecuted. *INS v. Cardoza-Fonseca, supra*. No reasonable person would be concerned or comforted, while being persecuted and tortured, with the fact that this Board may think, statistically, he might have escaped persecution. The very low 10 percent chance factor, articulated by Justice Stevens in *INS v. Cardoza-Fonseca, supra*, recognizes the fact of our international obligations, as codified in domestic statutes, and anticipates that we should afford, at least, a finding of eligibility for protection to all those who appear to have a "well-founded fear." *See also Matter of H-*, 20 I&N Dec. 337 (BIA 1996).

The United States Court of Appeals for the Ninth Circuit recently reversed and remanded a Board decision that dismissed a Peruvian respondent's appeal from the denial of his asylum claim, which was based on past persecution and a fear of future persecution by the Shining Path. *See Gonzalez-Neyra v. INS, supra*. In its decision, the court criticized the Board, in part, for its reliance on alleged "changed country conditions" evidence. The court observed that the Board relied upon portions of a February 1995 State Department Profile of Peru which "when reviewed as a whole, *supports petitioner's claim of continued Shining Path insurrection in the country at least as strongly as it*

*supports the BIA's position that conditions have changed for the better." Id.* at 1295 (emphasis added).

In its decision, the court made clear that an asylum-seeker claiming a well-founded fear of persecution is required to show only that (1) he holds a political opinion, (2) his political opinion is known to his persecutors, and (3) the persecution has been or will be on account of his political opinion. *Id.* at 1296 (citing *INS v. Elias-Zacarias*, 502 U.S. 478 (1992)). Like the applicant in *Gonzalez-Neyra v. INS*, the respondent has provided credible evidence that he held a political opinion antithetical to the Shining Path, that he expressed it through his APRA party activities, and that the Shining Path threatened him after he expressed his opinion. *See Gonzalez-Neyra v. INS, supra*, at 1296; *cf. Vera-Valera v. INS*, 123 F.3d 1302 (9th Cir. 1997) (holding that the asylum applicant, whose views and choices were purely to further economic benefit, failed to show a connection between fear of persecution by the Shining Path and political opinion). Thus, as argued, he clearly has established a well-founded fear of persecution.

Furthermore, the court in *Gonzalez-Neyra* criticized the Board's refusal to favorably exercise its discretion and grant the respondent's asylum claim. As in the present case, the Board's refusal rested upon its assessment of the "changed political climate in Peru" and the "unlikelihood of future persecution." *Gonzalez-Neyra v. INS, supra*, at 1296-97. According to the reviewing court, "[t]his hypothetical exercise of discretion rests on no firmer ground than the BIA's conclusion that petitioner was ineligible for asylum consideration, and constitutes an abuse of discretion." *Id.* at 1297.

The Ninth Circuit's conclusion is equally applicable to the country condition evidence upon which the majority relies in the instant case: "much of the report supports petitioner's claim that he has reason to fear similar persecution in the future." *Id.* at 1296. Rather than taking that criticism and absorbing it, this Board merely presses on to deny relief based on out-of-context statements in supposedly authoritative Department of State reports. Once again, the majority has issued its decision without regard to the actual conditions that inhere in the respondent's homeland.

I find noteworthy the majority's contention that "the instant case is controlled by neither *Gonzalez-Neyra v. INS, supra*, nor the law of the Ninth Circuit, but rather by the law of the Fourth Circuit." *Matter of A-E-M-, supra*, at 1161. Reservations about venturing outside the circuit in which a particular case arises did not prevent a majority of the Board from stating recently in *Matter of O-D-*, 21 I&N Dec. 1079 (BIA 1998), a case arising in the jurisdiction of the Court of the Appeals for the Second Circuit, that "[w]e find instructive a decision of the United States Court of Appeals for the Ninth Circuit which upheld the Board's adverse credibility finding in an asylum case. *Ceballos-Castillo v. INS*, 904 F.2d 519, 520 (9th Cir. 1990)." *Matter of O-D-, supra*, at 1082 (citing *de Leon-Barrios v. INS*, 116 F.3d 391 (9th Cir. 1997), for the same proposition).

Closer to home, in this very decision, the majority cites to the decision of the Ninth Circuit Court of Appeals in *Cuadras v. United States INS, supra*, at 571, as authority purportedly lending some significance to the fact that family members who remained in Peru after the respondent fled were not harmed during that time. Apparently, recourse to the authority contained in another circuit's decisions, no matter how applicable, is warranted only when such decisions support the majority's desired outcome. Given the recent precedent decisions of the Board, transferable circuit court cases would be those in which the reviewing court upholds the Board's decision to deny relief—particularly asylum relief. *See supra* note 5.

No matter what authority is relied on, the question remains, how great a threat must the respondent face in order to demonstrate a present well-founded fear? In support of its decision, the majority announces "that the 'dismantling of [the Shining Path's] command and control structure' has been accompanied by a greater than 50 percent drop in the number of people murdered by the organization." *Matter of A-E-M-, supra*, at 5 (quoting *Profile, supra,* at 4).

Query what this statistic tells us about the respondent's claim? For the sake of argument, let us agree that, based on the death threat and the killing of his similarly situated friends and co-workers, the respondent has presented evidence establishing that at the time he left Peru in 1989 he faced at least a 60 percent chance of being targeted and killed by the Shining Path. Such a presumption seems reasonable—even conservative—considering that his uncle, his cousin, and three of his friends who were fellow APRA party activists all were murdered by the guerrillas, and he received a painted message on his house warning that he was to be "the next one." If the Department of State is to be believed, then at present, approximately 8 years after the respondent's departure, his risk of being murdered has been reduced by half. Thus, following the majority's reasoning, the respondent currently faces only a 30 percent chance of being killed by the Shining Path if he returns to Peru. This probability can be considered an example of the majority's contention that "the Shining Path's ability to carry out retribution against its political opponents has diminished recently." *Matter of A-E-M-, supra*, at 1160.

To qualify for asylum, though, the respondent is not required to show that it is more likely than not that he would be harmed or killed. *Cf. Stevic v. INS,* 467 U.S. 407 (1984) (holding that eligibility for withholding of deportation requires a "clear probability" of persecution). He must demonstrate merely that he currently faces at least a 10 percent risk of persecution at the hands of the Shining Path on account of a protected ground. *See INS v. Cardoza-Fonseca, supra*, at 430-32. In their enthusiasm to provide evidentiary support for a predetermined (negative) result, the majority "has strayed from the central nature of the well-founded fear inquiry, which focuses on the *probability* of the alien's objective fears, not on the certainty of these fears." *M.A. v. United States INS, supra*, at 326 (4th Cir. 1990) (Winter, C.J.,

dissenting); *see also Cruz-Lopez v. INS*, 802 F.2d 1518, 1524 (4th Cir. 1986) (Winter, C.J., dissenting) (noting that in assessing the likelihood of persecution, "[c]ertainty is not possible, but certainty is not required").

## B. "Country-wide" Persecution and Reasonable Internal Relocation

Although an asylum-seeker may have a claim of a well-founded fear of persecution despite a reduction in the Shining Path's force, the majority seizes on an additional basis to deny asylum: the country-wide persecution concept. But, this is yet another area governed by established law that exposes and refutes the majority's conclusions under the circumstances of this case. *See* Guy S. Goodwin-Gill, *The Refugee In International Law* 42 (1983).[7]

The standard for determining whether an asylum applicant can relocate to a zone of safety in the country of persecution is "reasonableness." As addressed by the *Handbook, supra,* para. 91, at 21-22, for various reasons it may be *unreasonable* to expect the asylum-seeker to move internally. The internal relocation principle has been interpreted as being a limited restriction, applicable to persons who "can genuinely access domestic protection and for whom the reality of protection is meaningful." J. Hathaway, *The Law of Refugee Status* 134 (1991). Determinations of "reasonableness" include consideration of likely financial or logistical barriers to internal relocation, as well as the circumstances which fail to satisfy civil, political, and socioeconomic human rights norms, or place the refugee in illusory or unpredictable situations. *Id.*

The respondent testified that he participated in both local and national campaigns on behalf of APRA, a longstanding party known throughout Peru. Hence, his political activism was not limited to the area where he lived, and there is no evidence that he would be unknown to Shining Path guerrillas if he relocated away from the area where he previously resided. Moreover, he testified that he was "well known" to the Shining Path owing to his leadership of various sports groups. Such evidence refutes the majority's contention that the respondent has "not provided any evidence to suggest that [his] fear of persecution from the Shining Path would exist throughout that country." *Matter of A-E-M-, supra*, at 1160.

There is no presumption that the absence of affirmative evidence demonstrating that the persecutor operates nationwide means there is no basis for the victim to have a well-founded fear of persecution. *Damaize-Job v. INS*,

---

[7] There is no statutory, constitutional, or international requirement that an asylum applicant demonstrate "country-wide persecution." "[T]here is also no reason . . . why the fear of persecution should relate to the whole of the asylum-seeker's country of origin . . . ." Goodwin-Gill, *supra*, at 42 (1983); *see also* Sarah Ignatius, *Asylum: Country-Wide Persecution*, 21 Nat'l Immigr. Project of the Nat'l Law. Guild, Inc., Immigr. Newsletter, No. 1 (1993).

787 F.2d 1332, 1336 (9th Cir. 1986); *cf. Matter of R-*, 20 I&N Dec. 621, 627 (BIA 1992) (suggesting that the absence of evidence that there *is* persecution country-wide means that there *is not* persecution country-wide). Even were there some basis to conclude that persecution would be confined to a local area or when the persecutor is a nongovernmental force, consideration must be given to whether that authority has the inclination and ability to persecute the alien throughout the home country. *Matter of H-, supra*, at 349 n.6; *see also Singh v. Moschorak*, 53 F.3d 1031, 1034 (9th Cir. 1995); *Quintanilla-Ticas v. INS*, 783 F.2d 955, 957 (9th Cir. 1986) (finding the applicant ineligible where the danger of persecution was limited to a single village); *Matter of Fuentes, supra; Matter of V-T-S-*, 21 I&N Dec. 792 (BIA 1997) (Rosenberg, dissenting); *Matter of T-M-B-*, 21 I&N Dec. 775 (BIA 1997) (Rosenberg, dissenting); *Matter of C-A-L-*, 21 I&N Dec. 754 (BIA 1997) (Rosenberg, dissenting).

With respect to internal relocation, the *Profile* reports that although "Peru is a large, rugged country, and the guerrillas operate with relatively unsophisticated communications[,]" and therefore internal relocation "is available to many applicants[,]" it also is true that "the police and military are spread too thinly to protect every one threatened by the guerrillas." *Profile, supra*, at 6. Owing to the Shining Path's continued presence in Peru, and the breadth of the guerrilla efforts to destabilize the government, internal relocation within Peru is not a viable option for the respondent. *See Matter of C-A-L-, supra* (discussing internal relocation); *Handbook, supra*, para. 91, at 21-22.

Although the Shining Path is a nongovernmental force, the record reflects that the respondent is specifically known to them. There is no basis to infer that the guerrillas would be either unable or disinclined to target and persecute the respondent if he relocated. As noted, he was involved in political activities on both a local and national level, and he was recognizable as a leader of various sports groups. The guerrillas methodically targeted and murdered his friends and family members and unambiguously conveyed their resolve by leaving a written threat, on his own house, that he would be next. In light of such evidence, I find no reason to believe that the Shining Path's interest in the respondent was confined to a local area. *See Damaize-Job v. INS, supra*. I also find no reason to conclude that he would not be targeted merely because of the passage of time or the reduction in Shining Path forces.

## IV. CONCLUSION: THE RECORD SUPPORTS THE RESPONDENT'S CLAIM AND CONTAINS INSUFFICIENT EVIDENCE TO SUPPORT THE DENIAL OF RELIEF

The record does not contain evidence to support the denial of relief by the Immigration Judge, which is upheld by the majority. To support the conclusion that the respondent does not have a well-founded fear of persecution, the

majority's decision must reflect consideration of evidence that the Shining Path killed the respondent's friends and members of his family before them, and must address the sign painted on his house that he would be next under the "reasonableness" standard. *See Universal Camera Corp. v. NLRB*; 340 U.S. 474, 491 (1951) (holding that the "substantial evidence" standard has been understood to mean that the adjudicator's conclusions are expected to take into account and reflect in his decision, not only consideration of those facts in the record that support the conclusion, but evidence in the record that detracts from it).

As the Ninth Circuit observed in *Gonzalez-Neyra v. INS, supra*:

> [T]he majority of the BIA, and the immigration judge, overlooked the uncontradicted evidence that petitioner's life and business had been threatened only after he expressed his political disagreement with the guerrilla organization, and only after he made clear that his refusal to make further payments was on account of that disagreement.

> We conclude that any rational fact finder who took that evidence into account, as the BIA was required to do in this case, would be compelled to reach a contrary conclusion . . . .

Id. at 1294 (emphasis added).

The threats received by the respondent, and the murder of his co-workers, do not support the majority's conclusion, but detract from it. This evidence supports the conclusion that, given his known political activity, past experiences, and current conditions in Peru, a reasonable person would fear persecution. In light of his prior activity as an active APRA supporter and visibility as a local community leader, neither the passage of time nor any incremental change in conditions in the country undermines the undeniable fact that this respondent was threatened with persecution and death on account of his political affiliations and activities. The record compels the conclusion that the respondent currently faces at least a 10 percent likelihood that he will be persecuted by Shining Path guerrillas if he returns to Peru. *See INS v. Cardoza-Fonseca, supra*, at 430-32. Although the evidence of record from the Department of State indicates that the Peruvian Government has weakened the Shining Path, this evidence also reveals that "the Shining Path retains the capacity to launch destructive terrorist attacks even on well-protected targets," and still wages a "campaign of terror." *Profile, supra,* at 4. In light of this and other evidence of record, I cannot but conclude that a reasonable person in the respondent's situation has a well-founded fear of being persecuted because of his political opinion if he returns to Peru. *INS v. Cardoza-Fonseca, supra*, at 430-32; *Matter of Mogharrabi, supra*. I would grant the respondent's asylum claim.