**Fatouma CAMARA, Petitioner**

v.

**ATTORNEY GENERAL OF the UNITED STATES, Respondent.**

No. 07–3892.

United States Court of Appeals, Third Circuit.

Argued March 5, 2009.

Filed Sept. 4, 2009.

As Amended Nov. 4, 2009.

---

Camille J. Mackler, Esq., [Argued], Law Office of Theresa Napolitano, New York, NY, for Petitioner, Fatouma Camara.

Jeffrey S. Buckholtz, Esq., Emily Anne Radford, Esq., Patrick J. Glen, Esq., Craig Alan Newell, Jr., Esq., [Argued], United States Department of Justice, Civil, Division Office of Immigration Litigation, Washington, DC, for Respondent, Eric H. Holder.

Before SLOVITER and HARDIMAN, Circuit Judges, and POLLAK,* District Judge.

## OPINION OF THE COURT

POLLAK, District Judge.

Fatouma Camara ("Camara") petitions for review of a decision by the Board of Immigration Appeals ("BIA" or "the Board") denying her application for asylum under the Immigration and Nationality Act ("INA" or "the Act"), 8 U.S.C. § 1101 *et seq.* Because substantial evidence does not support the BIA's conclusion that Camara did not suffer past persecution—and hence does not have a well-founded fear of future persecution—we will remand.[1]

* Honorable Louis H. Pollak, Senior Judge of the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

1. This case was originally captioned with Michael B. Mukasey as United States Attorney General; the current Attorney General is substituted for the former occupant of that position pursuant to Federal Rule of Civil Procedure 25(d).

2. Except where otherwise noted, the facts in this section come from Camara's testimony in

## I. Facts

A.[2]

Camara was born in Abidjan, Ivory Coast, in 1980. She is a Muslim and a member of the Dioulla ethnicity. Her father, Camara Mamadi ("Mamadi"), was a founding member of the Rally of the Republicans ("RDR") political party. The RDR was a political party in opposition to the government of the Ivory Coast at the time of the events relevant to this case.

On or about October 29, 2002, a group of men, dressed in black and armed with rifles, came to Camara's home in Abidjan. Camara, her mother, and her father were at the home when the armed men—whom Camara refers to in her testimony as the "death squad"—arrived. The men accused Mamadi of supporting anti-government rebel forces and hiding weapons on the rebels' behalf. After searching the home but finding no such weapons, they nevertheless seized Mamadi and took him away by force. While leaving with Mamadi, they threatened to return to make Camara and the rest of her family "disappear" like Mamadi. Since that moment, neither Camara, her family, nor the RDR has had any contact with Mamadi.[3]

After waiting a few days for her father to return home to Abidjan, Camara, along with the remaining members of her family, traveled to Man, Ivory Coast, to stay with her father's brother. On or about November 18, 2002, anti-government rebels at-

front of the Immigration Judge, which, for reasons we explain in Section II, *infra,* we treat as credible.

3. In a signed letter dated February 17, 2007, the Permanent Secretary of the RDR confirms that Mamadi "disappeared in strange circumstances during the painful political events of the year 2002[,]" events in which "several [RDR] militants and sympathizers were victims of a bloody repression by the party in power across all of Ivory Coast." AR 197.

tacked Man and clashed with forces loyal to the government.[4] Although civilians were targeted in the attack, neither Camara nor her family was harmed.

On or about January 3, 2003, Camara moved to Guinea, where her mother left her in the care of a relative. Camara's new guardian in Guinea severely abused Camara, both physically and emotionally, by subjecting Camara to female genital mutilation ("FGM"); beating Camara with a whip in response to Camara's refusal to participate in an arranged marriage; and forbidding Camara from leaving the guardian's residence. Sometime in November 2006, Camara escaped from her residence in Guinea and hid briefly at a friend's home. On or about December 25, 2006, Camara flew to John F. Kennedy International Airport ("JFK") in New York.

### B.[5]

To put these events in context, we provide a short summary of the recent history that gave rise to them.[6] On September 19, 2002, a rebellion against the Ivory Coast's government began in three Ivorian cities: Abidjan, Bouake, and Korhogo. Many supporters of the RDR joined the rebel forces. The government encouraged and relied upon pro-government civilian militia groups to combat the rebels.[7] According to Human Rights Watch, these civilian militias constituted "a lightly veiled mechanism to intimidate and abuse members of the political opposition and those who, by virtue of their religion, ethnicity, and/or nationality were thought to oppose the government (most notably Muslims, northerners, and West African immigrants mostly from Burkina Faso, Niger, Mali, and Guinea)."

The rebels were unable to capture Abidjan, and the city became a central location of the conflict between pro-government civilian militia groups and those perceived to be rebels or Muslims. Even after the armed conflict officially ended in January 2003, the pro-government militias continued to commit human rights abuses against Muslims and others perceived to be opponents of the ruling regime.

### C.

Camara was detained immediately upon her arrival in New York on or about December 25, 2006. On January 8, 2007, she was granted, and passed, a "credible fear" interview with an asylum officer.[8] On Jan-

---

**4.** According to Human Rights Watch, the November rebellion was followed by a government occupation of Man in which "dozens of opposition and suspected rebel supporters were executed in reprisal killings." AR 268.

**5.** The facts in this section are culled from reports by Human Rights Watch and the United States Department of State that are contained in the Administrative Record.

**6.** We provided a similar and slightly more detailed history of this conflict, though from the perspective of a supporter of the government, in *Konan v. Attorney General*, 432 F.3d 497 (3d Cir.2005).

**7.** The "death squad" that captured Camara's father appears to have been one of these militias. According to a 2004 Human Rights Watch Report contained in the record, from September 2002 through January 2003, pro-government militias of the sort described by Camara committed "summary executions, political assassinations, torture, rape and other sexual violence, violations of medical neutrality, the wanton destruction of civilian property, physical attacks, a crackdown on the press, and the use of child soldiers." AR 266–67. That same report notes that between March 24–26, 2004, "20 individuals 'disappeared' after being taken into custody by the security forces (military, gendarmes, and police), pro-government militias, and FPI party militants around the time of an antigovernment demonstration planned by opposition groups." AR 268.

**8.** Under 8 U.S.C. § 1225(b)(1)(A)(ii), an alien arriving in this country who would normally be subject to expedited removal is referred to

uary 10, 2007, Camara was served with a Notice to Appear ("NTA") in Immigration Court in Elizabeth, New Jersey, charging that she was subject to removal. On January 22, 2007, Camara submitted an application for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"), and her case was assigned to an Immigration Judge ("IJ").

In the Immigration Court, Camara argued that she was entitled to asylum because she faced past persecution and had a well-founded fear of future persecution for reasons enumerated in 8 U.S.C. § 1101(a)(42)(A).[9] The IJ denied Camara's petition and found, *inter alia*, that (1) Camara's alleged past persecution in Guinea was "irrelevant" to her asylum claim because Camara is a citizen of the Ivory Coast, and "any persecution claimed by [Camara] must be from the country of nationality"; (2) Camara "herself did not sustain any mistreatment in the Ivory Coast" because her suffering in the Ivory Coast "was the type of suffering similarly experienced by others who live in a war-torn area where civil war is in place"; (3) "no objective evidence was presented" that Camara's father was abducted "on account of his ethnicity or religion"; and (4) there was no "objective evidence" to support a finding that Camara's fear of future persecution on account of her religion or ethnicity is "objectively reasonable." The IJ concluded that, despite "various outbreaks of disputes and unrest between these ethnic groups ... the evidence as a whole is not inclusive [sic] that the respondent would be mistreated or harmed if removed to Ivory Coast solely on account of her ethnicity," and that therefore Camara did not qualify for asylum or withholding of removal. The IJ also held that because it could not conclude that "the respondent would more likely suffer torture in her country by or with the consent or acquiescence of a public official acting under color of law," Camara was not eligible for relief under the Convention Against Torture.

On June 5, 2007, Camara timely filed an appeal with the BIA challenging the IJ's denial of her asylum petition. On August 31, 2007, the Board dismissed petitioner's appeal, holding, *inter alia*, that (1) petitioner's persecution in Guinea is irrelevant to her asylum application; (2) even assuming *arguendo* that Camara's account of her father's abduction was entirely credible and that his captors were centrally motivated by his ethnicity or religion, "their mistreatment of petitioner did not amount to past persecution"; and (3) Camara "has not shown that she obtained such notoriety amongst government officials in the Ivory Coast that she would be singled out by them for persecution." Therefore, the BIA concluded, conditions in the Ivory Coast do not indicate that Camara has a well-founded fear that returning to the Ivory Coast will result in persecution on account of her ethnicity or religion.

On September 28, 2007, Camara moved for reconsideration by the BIA. The BIA denied that petition on November 5, 2007. In that opinion, the BIA held that the facts of *Konan v. Attorney General of United States*, 432 F.3d 497 (3d Cir.2005), involved "significantly more severe [harm] than the harm [Camara] suffered when government officials came to her house" and that there-

---

an asylum officer for an interview if the alien indicates upon arrival that she intends to apply for asylum or that she fears persecution. "If the officer determines at the time of the interview that an alien has a credible fear of persecution," then the alien is scheduled for further immigration proceedings; otherwise, the alien is removed from the country without further review. 8 U.S.C. § 1225(b)(1)(B).

**9.** Those reasons are "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A).

fore Camara's "experiences during her father's arrest did not constitute persecution." The BIA also rejected Camara's argument that she was a member of a persecuted social group consisting of her family.

On September 26, 2007, Camara timely filed a petition for review of the BIA's August 31, 2007 final order of removal. She has not filed a petition for review of the BIA's denial of her motion to reconsider.

## II. Jurisdiction and Standard of Review

■ We have jurisdiction to review a final order of the BIA under 8 U.S.C. § 1252. "Ordinarily, Courts of Appeals review decisions of the Board of Immigration Appeals (BIA), and not those of an IJ." *Gao v. Ashcroft*, 299 F.3d 266, 271 (3d Cir.2002). We have jurisdiction to review the opinion of the IJ only where the BIA has substantially relied on that opinion. *See, e.g., Xie v. Ashcroft*, 359 F.3d 239, 242 (3d Cir.2004). In the instant matter, thus, we will review only those portions of the IJ's opinion that the BIA has specifically adopted. Because petitioner did not appeal the BIA's denial of her motion for reconsideration, we will not review that decision.[10]

■ We affirm any findings of fact supported by substantial evidence and are "bound by the administrative findings of fact unless a reasonable adjudicator would

be compelled to arrive at a contrary conclusion." *Yan Lan Wu v. Ashcroft*, 393 F.3d 418, 421 (3d Cir.2005) (citations omitted). Whether Camara has met her burden of showing a well-founded fear of future persecution "is a question of fact, and the agency determination must be upheld if it is supported by 'substantial evidence' in the record." *Gomez–Zuluaga v. Attorney General of the United States*, 527 F.3d 330, 340 (3d Cir.2008) (citations omitted).

■ In conducting our review, we will treat Camara's testimony as credible. Under the Act, "if no adverse credibility determination is explicitly made, the applicant or witness shall have a rebuttable presumption of credibility on appeal." 8 U.S.C. § 1158(b)(1)(B)(iii). Neither the IJ nor the BIA made a determination that Camara was not credible.

## III. Analysis

■ The Attorney General has the discretion to grant asylum to any alien who "is a refugee within the meaning of section 1101(a)(42)(A)" of the Act. 8 U.S.C. § 1158(b)(1)(A). Section 1101(a)(42)(A) defines a refugee as:

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or

---

**10.** The INA provides: "When a petitioner seeks review of an order [of removal], any review sought of a motion to reopen or reconsider the order shall be consolidated with the review of the order." 8 U.S.C. § 1252(b)(6). Interpreting this provision, the Ninth Circuit has stated that § 1252(b)(6) "contemplates two separate petitions for review: one from the BIA's decision ordering a petitioner removed and another from the BIA's decision denying a motion to reopen or reconsider." *Dela Cruz v. Mukasey*, 532 F.3d 946, 948 (9th Cir.2008) (citing *Stone v. INS*, 514 U.S. 386, 394, 115 S.Ct. 1537, 131 L.Ed.2d 465 (1995)); *see also Plasencia–Ayala v. Mukasey*, 516 F.3d 738, 744 (9th Cir.2008) ("The BIA's decision to grant or deny a motion to reconsider is treated as a separate and independent 'final order' for which the alien can seek judicial review."). Because Camara has not petitioned for review of the decision denying her motion to reconsider, we lack jurisdiction to review it.

herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A). "The asylum applicant bears the burden of establishing that he or she falls within this statutory definition of 'refugee.'" *Abdille v. Ashcroft*, 242 F.3d 477, 482 (3d Cir.2001) (citing 8 C.F.R. § 208.13(a) (2000)).

■ Under the statute, a petitioner can establish eligibility for asylum in one of two ways: (1) by showing past persecution, or (2) by showing a well-founded fear that she would be persecuted in the future if returned to her country of nationality.

■ Interpreting the first of those two avenues towards relief, we have stated:

In order to establish eligibility for asylum on the basis of past persecution, an applicant must show "(1) an incident, or incidents, that rise to the level of persecution; (2) that is 'on account of' one of the statutorily-protected grounds; and (3) is committed by the government or forces the government is either 'unable or unwilling' to control."

*Abdulrahman v. Ashcroft*, 330 F.3d 587, 592 (3d Cir.2003) (citations omitted). Regardless of past persecution, "[a]n applicant can demonstrate that she has a well-founded fear of future persecution by showing that she has a genuine fear, and that a reasonable person in her circumstances would fear persecution if returned to her native country." *Gao v. Ashcroft*, 299 F.3d 266, 272 (3d Cir.2002).

■ Although these two roads to asylum are doctrinally distinct from one another, they intersect. Unlike a demonstration of a well-founded fear of future persecution—which, without more, entitles an applicant to asylum—a demonstration of past persecution can be rebutted by the government if the government "establishes

by a preponderance of the evidence that the applicant could reasonably avoid persecution by relocating to another part of his or her country or that conditions in the applicant's country have changed so as to make his or her fear no longer reasonable." *Abdulrahman*, 330 F.3d at 592 n. 3 (citing 8 C.F.R. § 208.13(b)(1)(i-ii)). Put differently, "a showing of past persecution raises a presumption of a well-founded fear of future persecution" that shifts the burden of proof to the government. *Id.* at 592 (citing 8 C.F.R. § 208.13(b)(1)). Ultimately, therefore, a well-founded fear of future persecution is the touchstone of asylum.

■ In *Fatin v. I.N.S.*, we defined persecution as "threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom." 12 F.3d 1233, 1240 (3d Cir. 1993). Importantly, "the concept of persecution does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional." *Id.*

## A.

In the August 2007 opinion that is currently presented for our review, the BIA considered Camara's experiences in Abidjan, Man, and Guinea, and found that Camara did not experience "past persecution" as defined by the Act in any of those three locations. As a threshold matter, the BIA found that Camara's experiences in Guinea are not relevant to her asylum application.

■ We agree that petitioner's experiences in Guinea, though tragic, do not qualify her for asylum. 8 C.F.R. § 1208.13(b), a regulation implementing the Act, provides:

(1) Past persecution. An applicant shall be found to be a refugee on the basis of past persecution if the applicant can establish that he or she has suffered per-

secution in the past *in the applicant's country of nationality or, if stateless, in his or her country of last habitual residence,* on account of race, religion, nationality, membership in a particular social group, or political opinion, and is unable or unwilling to return to, or avail himself or herself of the protection of, that country owing to such persecution. . . . .

(1) Well-founded fear of persecution.

(i) An applicant has a well-founded fear of persecution if:

(A) The applicant has a fear of persecution *in his or her country of nationality or, if stateless, in his or her country of last habitual residence,* on account of race, religion, nationality, membership in a particular social group, or political opinion

. . . .

8 C.F.R. § 1208.13(b)(1–2) (emphasis added). As the BIA noted, Camara is not stateless, but rather is a citizen and national of the Ivory Coast. 8 C.F.R. § 1208.13(b) makes clear that only persecution in the applicant's "country of nationality" is relevant to a finding of past persecution or a well-founded fear of persecution.

**B.**

We do not agree, however, with the basis of the BIA's conclusion that Camara did not experience past persecution in the Ivory Coast. The BIA explained this holding in a single paragraph:

Even assuming *arguendo* that the government officials who came to the respondent's family home on one occasion in October 2002, falsely arrested her father for assisting rebel forces, and threatened the respondent and her family that they would return to the family home for them as well, were centrally motivated by a protected ground under the Act, their mistreatment of the respondent did not amount to past persecution (I.J. at 2–3; Tr. at 47–48). *See Fatin v. INS,* 12 F.3d 1233, 1240 (recognizing that persecution includes threats to life, confinement, torture, and economic restrictions that are *so severe* that they constitute a threat to life or freedom and that persecution does not encompass all treatment that our society regards as unfair, unjust, or unlawful) (emphasis added); *see also Matter of A–E–M,* 21 I & N Dec. 1157, 1159 (BIA 1998) (single threat did not rise to the level of persecution). Moreover, the respondent cannot establish that she suffered persecution during the general strife that occurred in her town in November 2002 between government loyalists and rebel forces (Tr. at 49). *See Al–Fara v. Gonzales,* 404 F.3d 733, 741 (3d Cir.2005) (providing that to qualify for asylum, "an applicant must do more than rely on a general threat of danger arising from a state of civil strife; *some* specific showing is required") (emphasis in original).

AR 34 (all emphases in original).

Other than citing to the black-letter definition of persecution laid down in *Fatin,*[11] the BIA relies on only one case, *Matter of A–E–M,* 21 I. & N. Dec. 1157 (BIA 1998), in support of its conclusion that Camara did not experience past persecution in Abidjan. In *Matter of A–E–M,* the petitioner, a Peruvian national and member of the APRA political party, alleged that af-

---

11. In asylum cases, reliance upon "boilerplate" language of this nature is "not particularly helpful in addressing the question at hand." *See Voci v. Gonzales,* 409 F.3d 607, 616 (3d Cir.2005) (reversing a determination that petitioner's experiences were not severe enough to amount to persecution). Moreover, the facts of *Fatin* are inapposite here. *Fatin* addressed whether the Iranian government's restrictions on the free expression of Iranian women constituted persecution.

ter many of his friends and relatives, all either APRA members or police officers, had been killed by the Shining Path guerilla group, "a painted phrase appeared on the exterior of his house indicating that he would be 'the next one,'" and petitioner "'assumed'" the sign was the work of the Shining Path. 21 I. & N. Dec. at 1158. *Matter of A–E–M* held that "the harassment that the primary respondent received in the form of a painted threat on his house does not rise to the level of persecution" and stated that "[a]side from this one threat, which the primary respondent could not definitively link to the Shining Path, the primary respondent admitted that neither he nor his immediate family had further encounters or problems with the Shining Path before his departure from Peru." *Id.* at 1159.

Meanwhile, in its brief on appeal, the government urges us to rely on *Li v. Attorney General of United States,* 400 F.3d 157 (3d Cir.2005), for the conclusion that Camara's having only "once been threatened by unknown assailants . . . is insufficient to constitute persecution under the INA." Resp. Br. at 23.[12] In *Li,* we held that the petitioner, a Chinese national who was threatened by government officials with sterilization following the birth of his fourth child and whose friend had been arrested and beaten for similar conduct, had not experienced past persecution. We observed that "'[t]hreats standing alone' . . . constitute persecution in only a small category of cases, and only when threats are so menacing as to cause actual 'suffering or harm.'" 400 F.3d at 164 (citations omitted). We also emphasized that "neither *Li* nor any of *Li*'s family members were actually imprisoned, beaten, sterilized, or otherwise physically harmed." *Id.* at 165.

The BIA and the government are correct that Camara's experiences in Man, where neither petitioner nor her family experienced any specific harm other than residing in a village that was under attack, were neither sufficiently severe nor individualized to meet the *Fatin* standard.

■ Camara's experience in Abidjan, however, was far more severe than that of the petitioners in *Matter of A–E–M* or *Li.* Unlike the petitioner in *Matter of A–E–M,* Camara witnessed the forcible seizure and removal of a parent to whereabouts unknown at the hands of a group that she can definitively identify as having directly and unambiguously threatened her with harm as well. Unlike the petitioner in *Li,* Camara did directly witness harm befall a member of her immediate family, and it would be reasonable to conclude that watching her father's abduction caused Camara actual suffering and harm, including (but not limited to) forcing her to flee her home. Rather than *Matter of A–E–M* or *Li,* the facts of *Konan v. Attorney General,* 432 F.3d 497 (3d Cir.2005), are most similar to the instant matter. In *Konan,* we held, *inter alia,* that substantial evidence did not support the BIA's conclusion that Konan did not suffer past persecution on account of imputed political opinion. Konan, the son of an Ivorian military police officer, witnessed rebel forces attack the military police camp where Konan lived with his father and brother. Konan, who was standing at the front entrance of the camp during the attack, "watched as the rebels shot through the hollow cement walls of his house, igniting the wooden furniture and propane tanks inside" and burning his brother and father alive. *Konan,* 432 F.3d at 499. The attack took place on September 19, 2002, during the same conflict that precipitated the events in the instant case.

*Konan* considered the issue of whether the petitioner's father was attacked because he was a police officer or, instead,

---

**12.** Like the BIA, the government also relies heavily on the standard from *Fatin.*

because he was a loyalist; if Konan's father had been attacked merely because he was a police officer, then the attack would not have constituted persecution on account of his political beliefs, but if he had been attacked for being a government loyalist, then the attack would have been past persecution on account of imputed political opinion. *See id.* at 504. We concluded that "the attack ... was motivated, at least in part, by a desire to kill presumed government loyalists because of their political beliefs," *id.* at 506, and therefore we remanded the case for further consideration.

In *Konan*, we did not directly analyze whether the attack there was itself sufficiently severe to amount to past persecution. Nevertheless, we did state our conclusion that "[a]pplying the substantial evidence test, [the evidence in *Konan*] 'was such that a reasonable factfinder would have to conclude that the

requisite fear of persecution existed.'" *Id.* (citing *I.N.S. v. Elias–Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992)). If anything, then, *Konan* indicates the near obviousness of the proposition that a person who has directly witnessed a brutal assault on a family member has experienced so devastating a blow as to rise to the level of persecution. Although here, unlike in *Konan*, petitioner's father was not killed in her presence, he was kidnapped, and that kidnapping was accompanied by direct threats to Camara and her family. Any difference in the severity of experiences between *Konan* and the instant matter is not the sort of difference that separates persecution from non-persecution. We therefore hold that the BIA erred in concluding that the "mistreatment" experienced by Camara "did not amount to past persecution." *See* AR 34.[13] That conclusion was not supported by substantial evidence.[14]

---

**13.** The government attempts to distinguish *Konan* from the instant matter on the ground that *Konan* predates the REAL ID Act, which amended the INA, because the REAL ID amendments require an asylum petitioner to "establish that at least one *central* reason for the alleged persecution was a statutorily protected ground." *See* Resp. Br. at 22–23 (emphasis in original) (citing 8 U.S.C. § 1158(b)(1)(B)(i)). The INA at the time of *Konan*, in contrast, required only that a petitioner establish that the alleged persecution was "on account of" a statutorily protected ground. The government's distinction, however, is irrelevant. *Konan*'s pertinence to the instant matter does not concern whether petitioner has shown that her persecution stemmed from a statutorily protected ground, *see* note 14 *infra*, but rather relates to how severe Camara's mistreatment must have been in order to constitute persecution.

**14.** Besides showing that the harm she experienced was severe enough to amount to persecution, Camara was also required to show that the harm was on account of a statutorily protected ground—e.g., her race, nationality, social group membership, or political opin-

ion. *See* 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(B)(i). The BIA concluded that Camara did not suffer past persecution "assuming *arguendo* that the government officials who came to [Camara's] family's home on one occasion in October 2002, falsely arrested her father for assisting rebel forces, and threatened [Camara] and her family that they would return to the family home for them as well, were centrally motivated by a protected ground under the Act." Prior to stating this conclusion, the BIA stated that it "agree[d] with the Immigration Judge that [Camara] has failed to demonstrate past persecution," citing to pages 7–9 of the IJ's opinion. In those pages of his opinion, the IJ states, *inter alia,* that "no objective evidence was presented by the respondent for the Court to even infer that her father was abducted by members of the death squad on account of his ethnicity or religion."

Had the BIA expressly adopted the IJ's conclusion that Camara's father's abduction was not on account of a statutorily protected ground, that holding might, arguably, have provided an independent basis for the BIA's conclusion that Camara did not experience

## IV. Conclusion

Accordingly, we will REMAND for further consideration consistent with this opinion.[15]

past persecution. But considering the BIA's blanket statement of agreement with the IJ in conjunction with the BIA's decision to nevertheless analyze the case under the assumption that Camara's father *was* abducted on account of a protected ground under the Act, we cannot tell whether the BIA meant to adopt the IJ's conclusion that Camara's father was not abducted on account of a protected ground. We must, therefore, review the BIA's opinion as if it did not adopt the IJ's conclusion. *See Abdulai v. Ashcroft*, 239 F.3d 542, 549 n. 2 (3d Cir.2001) ("In this case, the BIA never expressly 'adopted' any portion of the IJ's opinion or announced that it was deferring to any of the IJ's findings. We therefore review only the BIA's decision.")

On remand, the BIA may wish to consider this issue more directly.

15. The BIA also held that Camara "failed to establish an independent, objectively reasonable well-founded fear of future persecution if she is forced to return to the Ivory Coast." However, if, on remand, the BIA determines that Camara did experience past persecution, the burden will shift to the government to rebut the presumption that she possesses a well-founded fear of future persecution. Whether or not Camara has herself made such a showing, therefore, would not be dispositive.