NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-2481
_____

EFE FRANKLYN EDEKI,
                                        Petitioner
v.

THE ATTORNEY GENERAL OF THE UNITED STATES OF AMERICA,
                                        Respondent
_____

On Petition for Review from an
Order of the Board of Immigration Appeals
(Board No. A206-414-557)
Immigration Judge:  Mirlande Tadal
_____

Argued June 22, 2016
Before:  MCKEE, *Chief Judge*, FISHER and GREENAWAY, JR., *Circuit Judges*.

(Filed: August 23, 2016)

Joshua E. Bardavid  *[ARGUED]*
Suite 1501, 277 Broadway
New York, NY 10007

Theodore N. Cox
Suite 201, 325 Broadway
New York, NY 10007
        *Counsel for Petitioner*

Thomas W. Hussey
Neelam Ihsanullah
Loretta Lynch
Liza S. Murcia  *[ARGUED]*
Anthony C. Payne
United States Department of Justice

Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
 *Counsel for Respondent*

_____

OPINION[*]

_____

FISHER, *Circuit Judge*.

Efe Franklyn Edeki fled Nigeria to the United States where he was detained by immigration authorities. He sought relief in three forms: asylum, withholding of removal, and protection under the Convention Against Torture. The Immigration Judge denied his applications for relief, and the Board of Immigration Appeals (BIA) affirmed. Edeki now seeks review of the BIA's order. We will deny the petition.

I.

We write principally for the parties, who are familiar with the factual context and legal history of this case. Therefore, we will set forth only those facts that are necessary to our analysis.

Efe Franklyn Edeki is a native of Nigeria. He was born in Ugelli, Delta State, but he was raised by his aunt in Edo State. Edeki's father lived in Delta State—about three hours away—and Edeki would occasionally visit him there. In September 2013, Edeki's father was violently murdered at his home by members of the Neo Black Movement of Africa (or "Black Axe"). Edeki's father had been the chief priest of Black Axe but

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

2

renounced his membership when he converted to Christianity. Edeki's sister, who was at their father's house at the time of his death, was raped and beaten by members of Black Axe and later died of her injuries.

When Edeki learned of his father's death, he traveled with his aunt to Delta State. They contacted the police about the attacks, but the officer assigned to their case solicited bribes from them and then refused to investigate without payment. A week later, a funeral was held for Edeki's father. Members of Black Axe attended and were accompanied by policemen. Black Axe members summoned Edeki to the room where his father's body was kept. There the members performed rituals over the body—they sprinkled powder over it, recited incantations, and mutilated the body's genitals. Then the body was buried.

Later that day, a member of Black Axe approached Edeki and demanded that he join the group. Edeki refused on religious grounds, and the Black Axe member walked away angry. Three days later, Black Axe kidnapped Edeki as he was leaving church: they beat him, taped his mouth shut, and drove him in the trunk of a car to a Black Axe shrine. They removed Edeki's shirt and pointed to a mark on his chest, saying that the mark signified Edeki's pre-initiation into Black Axe. They told him that, because his father had been the chief priest of the cult, Edeki needed to join and assume that role.

Under the threat of castration and death, Edeki agreed to join Black Axe. For the next three days, Black Axe members held him captive and forced him to engage in various rituals such as blood oaths, beatings with a horsewhip, daily repetition of creeds, and animal sacrifices. Edeki was told that if he broke any of the rules of Black Axe he

3

would be castrated or killed. At the end of the three-day ceremony, Black Axe put Edeki back into the trunk of a car and dropped him off near his father's house.

Edeki fled Delta State to his aunt's house in Edo State. He did not report any of these events to the police. Edeki says he kept quiet because of threats by Black Axe and because he believed the police were heavily associated with the cult. Shortly after arriving in Edo State, Edeki found a note on his car that said Black Axe was watching him. When Black Axe also threatened his aunt and her family, she asked Edeki to leave. After Edeki left his aunt's house, his friends and family all turned him away in fear for their lives.

With nowhere else to go, Edeki fled Nigeria. He arrived in the United States in June 2014 and was detained by immigration authorities. An immigration officer determined that Edeki had a credible fear of persecution and arranged for further proceedings. The Department of Homeland Security served a Notice to Appear on Edeki, charging that he was subject to removal. Edeki appeared at a hearing in September before an Immigration Judge and sought relief in the form of asylum, withholding of removal, and protection under the Convention Against Torture.

The Immigration Judge denied Edeki's applications for relief, finding that he (Edeki) had not demonstrated that he had suffered past persecution on account of his membership in a particular social group.[1] In particular, the Immigration Judge concluded

---

[1]    Edeki's proposed social group was "individuals who have significant kinship ties to [Black Axe], but who consciously refuse to be in this cult." App. 15.

4

that Edeki had failed to show that his purported group was "socially distinct"—i.e., even though Edeki demonstrated that Black Axe exists in Nigeria, he did not show that those with kinship ties to Black Axe but who consciously refuse to be part of the group are seen as a socially distinct group. The Immigration Judge also found that Edeki had failed to show that the Nigerian government is unwilling or unable to control the alleged persecutors. Finally, the Immigration Judge found that Edeki had failed to demonstrate eligibility for protection under the Convention Against Torture because he did not demonstrate a clear likelihood that members of Black Axe would torture him upon his return or that such torture would be done with the acquiescence of the government. In January 2015, the Immigration Judge ordered Edeki's removal to Nigeria.

Edeki appealed the Immigration Judge's decision to the BIA. The BIA concluded that Edeki had not established that his proposed social group was regarded as a distinguishable group within Nigeria. The BIA also found that Edeki had not demonstrated a nexus between a protected ground and the reason for past harm. Thus, Edeki failed to establish past persecution and was not entitled to a presumption of a well-founded fear of future persecution. Moreover, Edeki did not, according to the BIA, independently establish a well-founded fear of future persecution on account of a protected ground. Accordingly, Edeki failed to meet his burden of proof for asylum relief and (necessarily) failed to meet the higher burden required for withholding of removal. Finally, the BIA found that the Immigration Judge did not err in finding insufficient evidence to establish that Edeki faces a probability of torture with the consent or

5

acquiescence of the Nigerian government so as to qualify for protection under the Convention Against Torture. Thereafter Edeki filed this petition for review.

## II.[2]

We review the BIA's legal conclusions de novo, giving deference under *Chevron v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), to the BIA's "interpretation of statutes and regulations within its enforcement jurisdiction."[3] We affirm any findings of fact supported by substantial evidence and are bound by the administrative findings of fact "unless a reasonable adjudicator would be compelled to arrive at a contrary conclusion."[4]

## A.

Under the Immigration and Nationality Act, the Attorney General may grant asylum to any alien who demonstrates that he meets the definition of a "refugee."[5] To establish that he is a refugee, an alien must demonstrate either proof of past persecution or a well-founded fear of future persecution in his home country "on account of race, religion, nationality, membership in a particular social group, or political opinion."[6] Persecution must be on the grounds of one of those five protected characteristics. Furthermore, "the acts must be committed by the government or forces the government is

---

[2] The Immigration Judge had jurisdiction over the proceedings pursuant to 8 C.F.R. § 1208.2(b). The BIA had jurisdiction over Edeki's appeal pursuant to 8 C.F.R. §§ 1003.1 and 1003.2. This Court's jurisdiction arises under 8 U.S.C. § 1252.

[3] *Huang v. Att'y Gen.*, 620 F.3d 372, 379 (3d Cir. 2010).

[4] *Camara v. Att'y Gen.*, 580 F.3d 196, 201 (3d Cir. 2009) (quoting *Yan Lan Wu v. Ashcroft*, 393 F.3d 418, 421 (3d Cir. 2005)).

[5] 8 U.S.C. § 1158(b)(1)(A).

[6] 8 U.S.C. § 1101(a)(42).

either unable or unwilling to control."[7] A more stringent standard applies to applications for withholding of removal: "an alien 'must establish a clear probability . . . that it is more likely than not that his life or freedom would be threatened if returned to his country' because of his protected class."[8]

Edeki attempted to show that he had suffered past persecution based on his membership in a particular social group, which he defined as "individuals who have significant kinship ties to the [Black Axe], but who consciously refuse to be in this cult."

The statutory term "particular social group" is ambiguous[9] and accordingly entitled to *Chevron* deference.[10] In *Matter of Acosta*,[11] the BIA interpreted the phrase "'persecution on account of membership in a particular social group' to mean persecution that is directed toward an individual who is a member of a group of persons all of whom share a common, immutable characteristic." We concluded that the BIA's interpretation of "particular social group" in *Acosta* was a permissible construction and thus adopted it.[12] A few decades later, however, the BIA supplemented the test for membership in a particular social group by adding the requirement of "social visibility."[13]

---

[7]  *Garcia v. Att'y Gen.*, 665 F.3d 496, 505 (3d Cir. 2011) (quoting *Sukwanputra v. Gonzales*, 434 F.3d 627, 637 (3d Cir. 2006)).

[8]  *Sesay v. Att'y Gen.*, 787 F.3d 215, 219 (3d Cir. 2015) (alterations omitted) (quoting *Kaita v. Att'y Gen.*, 522 F.3d 288, 296 (3d Cir. 2008)).

[9]  *Fatin v. INS*, 12 F.3d 1233, 1238–39 (3d Cir. 1993).

[10]  *Negusie v. Holder*, 555 U.S. 511, 516 (2009).

[11]  19 I. & N. Dec. 211, 233 (B.I.A. 1985).

[12]  *Fatin*, 12 F.3d at 1240.

[13]  *See, e.g.*, *Matter of S-E-G-*, 24 I. & N. Dec. 579, 582 (B.I.A. 2008) (explaining that "membership in a purported social group requires that the group have particular and well-defined boundaries, and that it possess a recognized level of social visibility"); *In*

7

In *Valdiviezo-Galdamez v. Attorney General*, we rejected the BIA's addition of the social visibility requirement, explaining that many of the particular social groups recognized by the BIA after *Acosta* lacked social visibility and would have failed under the new definition.[14] We remanded the case so that the BIA could clarify what is needed to prove the existence of a particular social group.[15] The BIA subsequently explained that a "particular social group" must be "(1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question."[16] The BIA explained the third prong, which replaced the "social visibility" requirement, as follows: "To be socially distinct, a group need not be seen by society; rather, it must be perceived as a group by society. Society can consider persons to comprise a group without being able to identify the group's members on sight."[17]

In this case, the BIA found that Edeki's proposed group did not qualify as a "particular social group" because it failed to meet the third prong, i.e., it lacked "social distinction." In his petition, Edeki challenges the BIA's newly articulated "social distinction" requirement. According to Edeki, there is no difference between this new requirement and the former "social visibility" standard that we rejected in *Valdiviezo-Galdamez*.

---

*Re A-M-E- & J-G-U-*, 24 I. & N. Dec. 69, 74 (B.I.A. 2007); *In Re C-A-*, 23 I. & N. Dec. 951, 959 (B.I.A. 2006).

[14] 663 F.3d 582, 604 (3d Cir. 2011).
[15] *Id.* at 608–09.
[16] *Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 237 (B.I.A. 2014).
[17] *Id.* at 240 (internal citations omitted).

We need not reach this issue, however, because the BIA affirmed the Immigration Judge on an additional basis: it found that Edeki had failed to establish a nexus between his membership in his proposed group and the persecution he suffered. Demonstrating the existence of a nexus is a separate and distinct requirement: "a key task for any asylum applicant is to show a sufficient 'nexus' between persecution and one of the listed protected grounds."[18] The BIA explained in its opinion that, "however [Edeki's] social group may be defined, [he] has not established that cult members targeted him to punish him for or to overcome his group membership."[19] As a result, the BIA concluded that Edeki "has not established that a protected ground was 'at least one central reason' for his past harm."[20]

The government rightly points out that Edeki failed to address this issue at any point in his opening (and only) brief. He has accordingly waived any argument that he actually established a sufficient nexus.[21] The requirement of a nexus is a separate element, and we have in the past denied petitions solely on the basis of a lack of nexus.[22] Because Edeki failed to address the issue, he has waived his right to present any

---

[18]    *Ndayshimiye v. Att'y Gen.*, 557 F.3d 124, 129 (3d Cir. 2009).
[19]    App. 7.
[20]    App. 8.
[21]    *Bradley v. Att'y Gen.*, 603 F.3d 235, 243 n.8 (3d Cir. 2010) (explaining that an argument that did not appear in petitioner's opening brief or in his reply brief was deemed waived).
[22]    *See, e.g.*, *Gomez-Zuluaga v. Att'y Gen.*, 527 F.3d 330, 350 n.10 (3d Cir. 2008) ("It is not necessary to determine whether [Petitioner's proposed group] is a cognizable 'particular social group' under the statute, because there is substantial evidence in the record to conclude that the [persecuting group] was not motivated by Petitioner's membership in a particular social group when they abducted her for eight days, but was instead motivated by a desire to recruit her.").

arguments to the contrary. Accordingly, we will deny the petition as it relates to his application for asylum and withholding of removal.

B.

"An applicant for relief on the merits under the Convention Against Torture bears the burden of establishing 'that it is more likely than not that he or she would be tortured if removed to the proposed country of removal.'"[23] There is no subjective component to this standard; rather, an alien must establish by objective evidence that he is entitled to relief.[24] If an alien meets his burden of proof, withholding of removal or deferring of removal is mandatory.[25] An alien seeking relief under the Convention Against Torture does not need to establish that torture is inflicted on account of a protected status.[26] Instead, he must "establish a likelihood of being subjected to torturous acts inflicted 'by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.'"[27]

In this case, the BIA found that Edeki had not demonstrated "that the Immigration Judge clearly erred in finding insufficient evidence in the record to establish that he faces a probability of torture, as defined by 8 C.F.R. § 1208.18(a), by or with the consent or acquiescence (including willful blindness) of an official of the Nigerian government, so

---

[23] *Sevoian v. Ashcroft*, 290 F.3d 166, 174–75 (3d Cir. 2002) (quoting 8 C.F.R. § 1208.16(c)(2)).

[24] *Id*. at 175.

[25] INA § 241(b)(3), 8 U.S.C. § 1231(b)(3); 8 C.F.R. §§ 1208.16–.18.

[26] *Silva-Rengifo v. Att'y Gen.*, 473 F.3d 58, 64 (3d Cir. 2007).

[27] *Id.* (alterations omitted) (quoting 8 C.F.R. § 1208.18(a)(1)).

as to qualify him for protection under [the Convention Against Torture]."[28] The BIA concluded that Edeki had "offered no persuasive evidence that the Nigerian government would be likely to torture him or acquiesce in his torture by others" and that he had therefore not met his burden of proof to establish eligibility under the Convention Against Torture.[29]

The evidence presented by Edeki does not compel a conclusion contrary to the one reached by the Immigration Judge and affirmed by the BIA. Although Edeki offered credible testimony that the police attended his father's funeral along with Black Axe, this does not, on its own, demand the conclusion that the Nigerian government acquiesced in any torture of Edeki. First, Edeki does not aver that the police were present for or aware of the rituals performed by Black Axe at that funeral. Second, those actions related to Edeki's father, not Edeki himself; Edeki has alleged no facts indicating that the Nigerian government acquiesced in or was willfully blind to Edeki's kidnapping or any other actions related to him personally. After all, Edeki never reported his kidnapping to the police, which undermines his claim that the Nigerian government acquiesced in his torture. Third, Edeki's testimony about the police officer's refusal to investigate the murder of his (Edeki's) father without a bribe may speak to the corruption of that police officer, but it does not establish that the Nigerian government would acquiesce in the torture of Edeki.

---

[28] App. 8.
[29] App. 8.

Given the weak link between the hypothetical torture of Edeki by Black Axe and the sparse evidence of Nigerian support, we cannot say that the evidence "compels the conclusion that [Edeki] has met this burden."[30] Accordingly, we will deny Edeki's petition on this ground as well.

## III.

Because Edeki has failed to show that the BIA erred in denying him asylum, withholding of removal, or protection under the Convention Against Torture, we will deny his petition for review.

---

[30] *Kang v. Att'y Gen.*, 611 F.3d 157, 166 (3d Cir. 2010).