NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-3160
_____

ANA MARGARITA O-O, M.D. R-O,
                                        Petitioners
v.

ATTORNEY GENERAL UNITED STATES OF AMERICA,
                                        Respondent
_____

On Petition for Review of an Order of the
Board of Immigration Appeals
Agency Nos. A208-446-964, A208-446-965
Immigration Judge: Honorable John B. Carle
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
June 14, 2018

Before: SMITH, *Chief Judge*, CHAGARES and FUENTES, *Circuit Judges*

(Opinion Filed: July 26, 2018)
_____

OPINION*
_____

_____

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

SMITH, *Chief Judge*.

Ana Margarita O-O (Ana) and her minor child M.D. R-O (M.D.) petition for review of a decision by the Board of Immigration Appeals (BIA) dismissing an appeal from the Immigration Judge's (IJ) denial of asylum and withholding of removal.[1] For the reasons that follow, we will deny the petition.

I.

Ana is a native and citizen of El Salvador. In 2015, she was served with a Notice to Appear charging her as an alien present in the United States without being admitted or paroled. She conceded removability and applied for asylum, withholding of removal, and protection under the Convention Against Torture (CAT).

During a hearing before an IJ, Ana testified that her daughter had been born in 2012, when Ana was sixteen. From the time of her daughter's birth until she left for the United States in 2015, Ana lived in El Salvador with her maternal grandfather, who was elderly and suffered medical problems. Because she and her grandfather were unemployed, they depended upon money sent by Ana's father, who lives in the United States. Ana and her grandfather typically went together to pick up the monthly checks, while Ana would handle household chores like paying bills and shopping.

_____

[1] Because M.D. is a rider on Ana's petition, this opinion will hereafter refer only to Ana as the petitioner. The IJ's decision notes that M.D. filed her own application for asylum, which the IJ addressed in a separate opinion. JA 08 at n.1. That decision is not before us.

2

In 2014, Ana received a threatening message from an unknown phone number. The unidentified individual indicated that he was contacting her on behalf of the Mara-18 gang and demanded that she pay them $1,000. Ana did not pay the $1,000, nor did she have access to such an amount. Although she initially thought the message was a joke, threatening calls persisted for six months, occurring as often as ten times per month. According to Ana, she thought gang members were targeting her "[b]ecause [she] was . . . a single woman." JA 83.

The calls stopped for a period when Ana changed her phone number, but soon resumed at her new number. In June or July 2014, while Ana was shopping, someone threw rocks at her home, breaking roof tiles and destroying the roof. Gang members later claimed responsibility, telling Ana it was because she had not paid them. Ana, her daughter, and her grandfather then relocated to a new neighborhood about two hours away. Despite the move, the threatening calls began again.

In August 2015, masked individuals came to Ana's home on two occasions, again demanding money. On the second occasion, they threatened Ana and her daughter with a gun and a knife. When Ana's grandfather arrived and tried to intervene, the intruders attacked him.

Ana did not report the incidents to the police, but she did contact the Mayor of her town, who told her it would be best for her to leave the country. Shortly thereafter, she and her daughter fled El Salvador. Ana's family arranged for and paid a smuggler, who

3

brought them to the United States in early September 2015.[2]  They now live in

Pennsylvania with Ana's parents, her siblings, and M.D.'s father.

The IJ found that Ana testified credibly to having suffered past harm in the form

of concrete, imminent death threats from gang members.  The IJ considered whether Ana

had suffered that harm on account of her membership in a "particular social group"

(PSG), described as "Salvadoran single female heads of households responsible for the

household's support."  JA 15.  The IJ concluded that this proposed PSG was not

sufficiently "particular" because it did not have discrete and definable boundaries.  In

addition, the PSG was not "socially distinct" because the members of the proposed group

do not possess a trait meaningfully distinguishing them from the rest of the society.

Finally, even if the proposed PSG was cognizable, the IJ determined that Ana did not

establish the necessary nexus between the harm she suffered and her membership in the

proposed PSG.  The IJ therefore denied the asylum and withholding claims.[3]

Ana appealed to the BIA.  The BIA found no clear error in the IJ's findings of fact

and agreed with its determinations that Ana failed to establish membership in a cognizable

PSG and that she failed to establish a nexus between harm she suffered and any PSG

membership.

Ana timely filed this petition for review.

---

[2] Ana's grandfather remained in El Salvador and relocated to a different part of the country.

[3] The IJ denied Ana's CAT claim on different grounds.  She does not appeal the CAT claim denial.

4

II.

We have jurisdiction to review the BIA's final order of removal under 8 U.S.C. §1252(a). *Shehu v. Att'y Gen.*, 482 F.3d 652, 656 (3d Cir. 2007). Although we review the BIA's decision, we consider the IJ's opinion as well "where the BIA has substantially relied on that opinion." *Camara v. Att'y Gen.*, 580 F.3d 196, 201 (3d Cir. 2009).

III.

Ana claims she is a refugee and is therefore eligible for asylum because she has "a well-founded fear of persecution on account of . . . membership in a particular social group." 8 U.S.C. § 1101(a)(42)(A). To prove this, Ana bore the burden of establishing: (1) the existence of a particular social group that is legally cognizable; (2) her membership in that social group; (3) a subjectively honest and objectively reasonable fear of persecution; and (4) a nexus between her membership in the social group and her persecution. *S.E.R.L. v. Att'y Gen.,* -- F.3d --, 2018 WL 3233796 at *4 (3d Cir. July 3, 2018). Ana's petition for review focuses on whether the proposed PSG is cognizable and whether she established a nexus between the harm she suffered and her membership in the proposed PSG.

A.

"[T]he existence of a cognizable particular social group presents a mixed question of law and fact, since the ultimate legal question of cognizability depends on underlying factual questions concerning the group and the society of which it is a part." *Id.* at *3. Therefore, we review de novo the legal conclusion as to whether a particular social group exists, and we review the underlying factual findings for substantial evidence. *Id.*; *see*

*also* 8 U.S.C. § 1252(b)(4)(B) ("[A]dministrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.").

According to the BIA, a cognizable PSG must: (1) have members that share a common, immutable characteristic; (2) be particularized; and (3) be socially distinct. *Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 237 (BIA 2014). A common, immutable characteristic is one that "the group either cannot change, or should not be required to change because it is fundamental to their individual identity or consciences." *Matter of Acosta*, 19 I. & N. Dec. 211, 233–234 (BIA 1985). To be particularized, a PSG must have "discrete and definable boundaries" that are not "amorphous, overbroad, diffuse, or subjective." *M-E-V-G-*, 26 I. & N. Dec. at 239. And finally, "'[s]ocial distinction' means social recognition, or 'whether the people of a given society would perceive a proposed group as sufficiently separate or distinct.'" *S.E.R.L.*, 2018 WL 3233796 at *8 (quoting *M-E-V-G-*, 26 I. & N. Dec. at 241). Social distinction does not mean that the group's characteristics must be literally visible to the eyes. *M-E-V-G-*, 26 I. & N. Dec. at 240. Our Court has concluded that the BIA's approach to determining whether a PSG is cognizable is reasonable and entitled to deference under *Chevron, U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837 (1984).[4] *S.E.R.L.*, 2018 WL 3233796 at *10.

---

[4] In her brief, Ana argued that the BIA's approach should not be afforded *Chevron* deference. Recently, however, this Court considered the issue and ruled otherwise. *See S.E.R.L.*, 2018 WL 3233796 at *10.

Relying on the IJ's factual findings, the BIA concluded that Ana's proposed PSG lacks particularity and social distinction.[5] We agree. Most notably, Ana did not establish that there is a widely accepted definition of "head of household" that meets the particularity requirement. While one might reasonably conclude that a "head of household" is an adult individual who is responsible for her family's financial support, Ana testified that she was a teenager while she was targeted and that she was unemployed and not responsible for financially supporting her household. Thus, while she describes herself as "head of household," it is not clear precisely why Ana should qualify. Such a vague phrase is "amorphous, overbroad, diffuse, or subjective," *M-E-V-G-*, 26 I. & N. Dec. at 239, and therefore is not sufficiently particular.

We also agree that the BIA correctly upheld the IJ's finding that the proposed PSG does not include "a trait that meaningfully distinguishes [the PSG members] from members of the society that do not possess the same trait." JA 16. Simply put, Ana did not put forth substantial evidence that El Salvadoran society recognizes this group as socially distinct.

As support for the existence of her PSG, Ana points to several articles detailing programs in El Salvador that are geared towards benefitting women. Yet none of the articles explicitly address the proposed PSG. None of the articles describe programs designed specifically for single women, and only one article, titled "Women

---

[5] The IJ agreed with Ana that "single female heads of households" share an immutable characteristic. The BIA did not address this element, and we do not consider it here.

7

Entrepreneurs Reaching Their Goals," even includes the phrase "heads of households." JA 230–33. While that article discusses government efforts to stimulate the economy through female entrepreneurship, it simply mentions that most women participating in the program are the heads of their households. This scant evidence does not compel a conclusion that society recognizes "Salvadoran single female heads of household responsible for the household's support" as a socially distinct group within El Salvador.

Ana also argues that people in her area knew she was a single female who was the head of her household and that there were other single female heads of household in her neighborhood.[6] Even if true, the social distinction element is not met by merely creating

---

[6] Ana cites her own testimony in support, yet that testimony did not go as far as she contends in her brief. Ana argues that "she was known around the area in which she lived as the head of her household." Pet. Br. 16. Her testimony, however, addresses only Ana's interactions with her own household members, not anyone else. *See* JA 66. In addition, she argues that "there were other single female heads of households in other families in her area." Pet. Br. 16. That may be so, but her testimony merely establishes that there were others in her town whose relatives live in the United States:

> A: Well, because once I had my daughter, I, I had to take care of her and, right, I didn't have anyone else also to, you know that could take care of her for me, so that's, that's what I did.
> Q: Okay. In your town were there a lot of people in a similar situation?
> A: Yes. Definitely.
> Q: Just to be more specific, people with families in the United States who were living on their own?
> A: Yes.

JA 67. Notably, this exchange was not specific to women at all, let alone to "single female heads of households responsible for the household's support."

a label that describes one's position in society. *See*, *e.g.*, *S.E.R.L.*, 2018 WL 3233796 at

*15 (concluding that "immediate family members of Honduran women unable to leave a

domestic relationship" is not a socially distinct PSG); *Matter of W-G-R-*, 26 I. & N. Dec.

208, 217 (BIA 2014) (concluding that "former gang members" is not a socially distinct

PSG).

Ana has not identified substantial evidence that El Salvadoran society views

"Salvadoran single female heads of household responsible for the household's support"

as a distinct PSG. Because we may reverse the BIA's determination only if the evidence

compels a contrary conclusion, we will uphold the BIA's determination that Ana did not

posit a cognizable PSG. *See Gonzalez-Posadas v. Att'y Gen.,* 781 F.3d 677, 684 n.5 (3d

Cir. 2015) (citing *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992)).

B.

Even if we were to recognize "Salvadoran single female heads of households

responsible for the household's support" as a cognizable PSG, Ana has not shown the

harm she suffered was on account of her membership in the group she defined.

*Ndayshimiye v. Att'y Gen.*, 557 F.3d 124, 129 (3d Cir. 2009) ("[A] key task for any

asylum applicant is to show a sufficient 'nexus' between persecution and one of the listed

protected grounds."). Ana does not point to evidence that would compel a reasonable

factfinder to reverse the BIA's determination in this regard. *See Fei Mei Cheng v. Att'y

Gen.*, 623 F.3d 175, 195 (3d Cir. 2010); *see also* 8 U.S.C. § 1252(b)(4)(B).

9

Before the IJ, Ana did not testify to any clear belief about the reason she was targeted, stating only that it occurred "[b]ecause I was a, a single woman, I think."[7] JA 83. Here, she argues that she meets the nexus requirement because: (1) the persecution occurred when she was at home, showing that it "centered around the very household she supported," Pet. Br. at 20; and (2) there is "targeted violence against women in El Salvador," Pet. Br. at 19.

First, the occurrence of the harm at her home, without more, does not provide substantial evidence of the motive of her attackers. Gang members could have just as reasonably targeted Ana at her home because it was a private location where they knew they could find her.

Second, while Ana presented some evidence that there is targeted violence against women in El Salvador for reasons including profit, silencing political opposition, and ensuring gang control, this does not establish a nexus between the harm Ana suffered and her status as a "Salvadoran single female head of household responsible for the household's support." The BIA determined that Ana did not show that the harm was "on account of her membership in the group she defined, rather than for other reasons such as the gang's perception that she has money." JA 5. We will not disturb this conclusion. Ana has not put forth substantial evidence to suggest why she was targeted. As such, a reasonable factfinder would not be compelled to reverse the BIA's decision.

---

[7] Ana's belief is undermined by the fact that the gang members targeted both men and women. For example, she testified that her boyfriend's father was similarly threatened and asked for money.

10

IV.

To prevail on her claim for withholding of removal under 8 U.S.C. § 1231(b)(3),

Ana must "establish a 'clear probability of persecution,' *i.e.*, that it is more likely than

not, that [she] would suffer persecution upon returning home." *Valdiviezo-Galdamez v.*

*Att'y Gen.*, 663 F.3d 582, 591 (3d Cir. 2011) (citing *INS v. Stevic*, 467 U.S. 407, 429–30

(1984)). "Since [that] standard is more demanding than that governing eligibility for

asylum, an alien who fails to qualify for asylum is necessarily ineligible for withholding

of removal." *Id.* Therefore, because Ana failed to establish her eligibility for asylum,

she is unable to succeed on her withholding of removal claim under INA § 241(b)(3).

V.

For the foregoing reasons, the petition for review will be denied.

11